# FOR PUBLICATION



ATTORNEY FOR APPELLANT:

**NICOLE A. ZELIN**
Greenfield, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**AARON J. SPOLARICH**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| MICHAEL WILLIAMS, JR., | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 30A01-1207-CR-305 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE HANCOCK SUPERIOR COURT
The Honorable Terry K. Snow, Judge
Cause No. 30D01-1112-FB-2149

**March 4, 2013**

**OPINION - FOR PUBLICATION**

**VAIDIK, Judge**

**Case Summary**

Michael Williams, Jr., appeals his convictions for Class B felony burglary, Class B felony conspiracy to commit burglary, and Class C felony carrying a handgun without a license. During his jury trial, a deluge of Williams' prior criminal acts were admitted into evidence without objection and used by the State to argue Williams' propensity to commit the crimes for which he was charged. Because of this, we find that Williams' trial counsel's performance was deficient. We also find that Williams was prejudiced by his counsel's deficient performance, so we reverse and remand for a new trial.

**Facts and Procedural History**

The facts most favorable to the verdicts follow. In November 2011, Williams and Nicholas Tate discussed burglarizing the house of Gregory Peek. Tate knew Peek through his family and was aware that Peek owned guns. In addition to guns, Williams and Tate also thought that they could steal marijuana and money from Peek.

On December 8, 2011, Williams went to Tate's house with a mutual friend, Donald Warren, and told Tate that "its [sic] time to go." Tr. p. 177. Tate hesitated, so Williams said, "[c]ome on now or I'm gonna beat your ass." *Id.* at 128. Tate then joined Williams and Warren and the three drove to Peek's house in New Palestine. Tate parked the car in Peek's driveway and went up to the front door and began knocking. Peek was asleep in a second-floor bedroom and awoke to the knocks. Peek walked to the end of the stairway and looked out the front door. He saw a bluish-gray car and a white male but could not clearly see his face; he thought that the man knocking was a former

2

employee that he had fired a few weeks ago. Because Peek did not want a confrontation, he did not answer the door and went back to bed.

Tate returned to the car, and the three men tried to find an alternate way into Peek's house. They left the subdivision, returned, and parked the car in the rear of the house. Williams and Tate got out of the car while Warren remained inside the car. Williams and Tate went to the service door on Peek's attached garage, and Williams kicked open the door. This left the service door with a muddy footprint on it, but there was no evidence of damage to the frame or door jam. *Id* at 122. Peek heard the noise but went back to sleep, believing it to be the garbage truck. *Id.* at 38. But, when Peek heard chairs in the kitchen moving over the ceramic-tile floor, he jumped out of bed and ran downstairs. *Id.* When Peek was almost at the bottom of the stairs, he saw a man standing near the kitchen table pointing a gun at him. Peek ran out of his front door while calling 911 on his cell phone.

As Peek ran out of his house, he saw the same bluish-gray car as when he heard a man knocking on his door earlier. *Id.* at 46. Tate heard Williams running out of the house at this time, too, so he ran back to the car. Peek watched as Tate jumped into the driver's seat and drove away with only Warren in the car. Williams ran out of the service door as Tate and Warren drove away. Peek could not see Williams' face, but he noticed his clothing; Williams was wearing a jacket with a red dragon design on the back with various colors, dark pants, and brown boots. Williams ran toward the back of Peek's property, jumped a fence, and continued running.

3

Tate and Warren drove to a nearby gas station and were seen on surveillance video. Meanwhile, Williams called the phone that Tate often used, but Tate's girlfriend answered instead. Williams said that "it went wrong" and "I'm in a ditch, come and get me." *Id.* at 129-30. Williams then called Warren. Warren turned on the speaker function on his phone so Tate could hear, too, and Williams told Warren and Tate that he was in a ditch next to a Marsh grocery store. Tate then dropped Warren off, left the car at a construction site, and walked home.

New Palestine Police Department Chief Robert Ehle arrived at Peek's house and began establishing a perimeter to find Williams. Shelby County Sheriff's Department Deputy Louis Koch showed up with his canine, Paco. Paco led Deputy Koch to a nearby ditch. Williams then jumped up from the ditch and stated that he gave up. Within Williams' reach were a black hooded jacket with a red dragon design on the back, a pair of gloves, and a bandana. While Chief Ehle secured Williams, Deputy Koch began searching the area with Paco. Paco led Deputy Koch along the ditch line and back until they reached the fence that enclosed Peek's property. The gun Peek said was pointed at him by the burglar was never recovered from the scene.

Back at the ditch, Williams denied owning the black jacket with the red dragon design. But, it was a cold day, so when Chief Ehle asked Williams "if he would like to put his jacket back on," *id.* at 92, Williams responded affirmatively and put on the jacket. Hancock County Sheriff's Department Captain Kevin Haggard brought Peek to the scene in order to identify Williams. When Peek arrived, he could not identify Williams' face, but he could identify Williams by his jacket and his boots.

4

Later, Captain Haggard interviewed Williams at the police station. Initially, Williams claimed he had no knowledge of the burglary and was only in the area because his girlfriend had dropped him off there after they had gotten into an argument. Williams repeatedly told Captain Haggard that he was working with Detective Scott Wolfe of the Indianapolis Metropolitan Police Department (IMPD). Williams also maintained throughout the interview that he never entered Peek's house, but he did eventually admit that he was outside the house and it was a white male named Nick who actually entered the house. *Id.* at 147. Captain Haggard then interviewed Tate; Tate confessed to being part of the burglary and said that Williams was the person who entered Peek's house. Appellant's App. p. 14-15.

The State charged Williams with Class B felony burglary, Class B felony conspiracy to commit burglary, and Class A misdemeanor carrying a handgun without a license. Tate was charged with burglary and conspiracy to commit burglary. State's Ex. 22. A jury trial was held.

At trial, Peek testified that he saw a man with a gun in his house that day. Tr. p. 45. Tate testified with use immunity implicating Williams as the burglar. No witness, other than Peek, indicated that Williams had a gun that day, nor was one found. Williams testified on his own behalf, arguing that he was working as a confidential informant in drug cases for Detective Wolfe at the time he entered Peek's house. He claimed that he was there to purchase drugs and guns from Peek as part of his duties as a confidential informant. Williams also denied that he had a gun. Appellant's App. p. 14. On cross-examination, the State asked why Williams was working as a confidential informant, and

5

Williams testified that he had been charged with possession of cocaine and a firearm. *Id.* at 235. The State then admitted into evidence, without objection, documents showing that Williams had been charged with five counts of drug and gun charges, pled guilty to one count of Class C felony possession of cocaine and a firearm, and was placed on home detention. State's Ex. 27-29. The State then elicited testimony from Williams, again without objection, that while on home detention, community corrections officers searched his home and found him to be in possession of cocaine, heroin, and more than one gun. Tr. p. 240.

Williams then called Detective Wolfe as a witness to confirm his role as a confidential informant, but not as to this case. On cross-examination by the State, Detective Wolfe testified, without objection, that Williams tested positive for marijuana while on community corrections and that Williams admitted to him that he had committed previous unspecified burglaries, robberies, and gun-trafficking offenses. *Id.* at 260. Detective Wolfe also spoke as to his knowledge of Williams' previous possession of heroin, firearms, and a stolen IMPD taser. *Id.* at 259.

The jury found Williams guilty on all charges. Williams then admitted that he had been convicted of a felony within the past fifteen years, elevating his Class A misdemeanor carrying a handgun without a license conviction to a Class C felony. At sentencing, the trial court did not find any mitigating factors and found as aggravating factors Williams' history of criminal activity and that he was out on bond when he committed the current offenses. The trial court sentenced Williams to fifteen years for

burglary, fifteen years for conspiracy, and four years for carrying a handgun without a license, all to run concurrently.

Williams now appeals.

## Discussion and Decision

Williams raises five arguments on appeal: (1) whether he received ineffective assistance of trial counsel; (2) whether there is sufficient evidence to sustain his burglary conviction; (3) whether there is sufficient evidence to sustain his conspiracy to commit burglary conviction; (4) whether there is sufficient evidence to sustain his carrying a handgun without a license conviction; and (5) whether his sentence is inappropriate in light of the nature of the offenses and his character. However, since we find that Williams received ineffective assistance of trial counsel and reverse his convictions, we need not address his sentencing argument.

## I. Ineffective Assistance of Counsel

Williams contends that he received ineffective assistance of trial counsel. While a "postconviction hearing is normally the preferred forum to adjudicate an ineffectiveness claim," *Woods v. State*, 701 N.E.2d 1208, 1219 (Ind. 1998), ineffective assistance of counsel claims may also be raised on direct appeal. *Benefiel v. State*, 716 N.E.2d 906, 911 (Ind. 1999). To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate both that his counsel's performance was deficient and that the petitioner was prejudiced by the deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Failure to satisfy either prong will cause the claim to fail. *French v. State*, 778 N.E.2d 816, 824 (Ind. 2002).

Counsel's performance is deficient if it falls below an objective standard of reasonableness based on prevailing professional norms. *Id.* Counsel is afforded considerable discretion in choosing strategy and tactics, and we will accord those decisions deference. *Timberlake v. State*, 753 N.E.2d 591, 603 (Ind. 2001), *reh'g denied*. A strong presumption arises that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Id.* To meet the appropriate test for prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Perez v. State*, 748 N.E.2d 853, 854 (Ind. 2001).

Williams argues that his trial counsel was deficient by failing to object under Indiana Evidence Rule 404(b) to the admission into evidence of his previous bad acts and convictions. We agree.

Rule 404(b) precludes the admission of other crimes or bad acts in order to show circumstantially that a person charged with a criminal offense has a propensity to commit criminal acts and therefore is more likely to have committed the crime charged. The so-called "propensity rule" prohibits evidence of prior criminal acts admitted solely to create the "forbidden inference" that because the defendant committed prior criminal acts, he is more likely to have committed the act charged. *See Hardin v. State*, 611 N.E.2d 123, 129 (Ind. 1993).

The extent of the prior bad acts admitted into evidence at Williams' trial was breathtaking. Evidence of his felony conviction for possession of cocaine and a firearm –

a conviction not admissible for impeachment under Indiana Evidence Rule 609 – was disclosed. Evidence of his previous arrest for possession of marijuana, possession of a controlled substance, and carrying a handgun without a license was also admitted. State's Ex 27-29. The jury learned that Williams had marijuana in his system and possessed heroin, guns, and a stolen IMPD taser while he was on home detention. Tr. p. 252-53, 260. And the jury learned of unspecified burglaries, robberies, and trafficking in weapons that Williams admitted to Officer Wolfe that he had committed. *Id.* at 260.

Not only was evidence of Williams' criminal acts admitted but the State during its closing argument argued

> He says he doesn't do burglaries. That's not his MO. Just guns and drugs which is admittedly what they were looking for, guns and drugs. Yet he admitted to Scott Wolfe when Scott Wolfe first got this relationship going with him that he hit licks.[1] Hit licks. And that's the same term he used with the detective when he said, Nicholas Tate was hit[ting] lick[s]. Oh yeah. Well by his own admission he's hit[ting] licks. These are admissions that this man made himself. He had a stolen I[M]PD taser in his possession and he was not acting as an agent of the Police Department on that day.

*Id.* at 296. The State's argument explicitly asked the jury to make "the 'forbidden inference' – that the defendant acted badly in the past and that the defendant's present, charged actions conform with those past bad acts." *Hardin*, 611 N.E.2d at 129. This evidence was not relevant to a matter at issue other than Williams' propensity to commit the charged crimes and therefore was not admissible under 404(b). Because Williams' attorney did not object to the admission of this evidence nor to the prosecutor's statements at closing, her conduct was deficient.

---

[1] Hitting licks was explained by Officer Wolfe to mean committing burglaries and robberies. Tr. p. 260.

9

Nonetheless, the State argues that defense counsel's decision to allow these prior bad acts into evidence was strategic. Specifically, the State argues that the jury could have speculated as to what crimes were committed by Williams that led him to be a confidential informant. So, the argument goes that counsel made a decision to show the jury that Williams was completely truthful and not hiding anything. Given the breadth and depth of his prior criminal acts—from possession of drugs and guns to committing burglaries and robberies—and the similarity of these acts to the allegations here, we cannot say that allowing all of Williams' past transgressions into evidence was justified as a tactical decision as part of a reasonable trial strategy.

Having determined that counsel's performance was deficient, Williams must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Timberlake*, 753 N.E.2d at 603 (citing *Strickland*, 466 U.S. at 694). We are not confident that without the evidence of Williams' prior crimes and gun-related acts the result of the proceeding would have been the same. Learning of an extensive criminal history of an accused surely weighs heavily on the minds of jurors. This is especially so when the criminal history is similar to the charged offenses as here; Williams was charged with burglary and possession of a gun and the evidence of prior crimes included the very crimes with which he was charged.

As to the gun offense, Williams denied that he had a gun. With the exception of Peek, the homeowner who allegedly had guns and marijuana in his house, no one testified that Williams possessed a gun, nor did the police find a gun. Without the evidence of Williams' prior crimes involving guns, the evidence was Peek's word against Williams'

10

word. We will never know the true amount of prejudice caused by the admission of Williams' criminal history, but the sheer quantity of past offenses admitted undoubtedly tainted the jury's mind and eviscerated Williams' credibility. We therefore cannot say with certainty that the jury was able to fairly weigh the conflicting testimony and come to an unbiased resolution as to which testimony to believe.

With this clear prejudice on the gun offense, the jury would not have been able to eliminate that prejudice when evaluating the evidence for the conspiracy to commit burglary and the burglary offenses where it again had to decide whether to believe the testimony of Tate and Peek or Williams. There was considerable evidence that Williams burglarized Peek's home: Tate's testimony; Peek's testimony; Williams' contradictory statements to the police; and Williams' flight from the scene. Williams' defense at trial was that he was at Peek's house to purchase drugs as part of his role as a confidential informant. Although Detective Wolfe testified that Williams was not acting as a confidential informant during these events, he did indicate that Williams was a confidential informant for his department. Tr. p. 262, 265. There was other evidence at trial that seems to support Williams' testimony. For example, although there was a shoeprint on the door that Williams was said to have forced open, there was no indication of a broken door casing or jam. *Id.* at 165. Also, the lion's share of the evidence regarding Williams' intent was from Tate and Peek, both of whom had potential credibility problems. Tate was Williams' accomplice who testified under a grant of use immunity. And, if the jury were to believe Williams, Peek was someone Williams and Tate expected to steal marijuana from.

11

In other words, with Williams' credibility seriously undermined by the admission of the extensive prior bad act evidence, we believe there is a reasonable probability that the results of the proceeding would have been different but for counsel's deficient performance. Allowing that magnitude of past bad acts into evidence resulted in clear prejudice to Williams and, as a result, a verdict that was not fairly reached. Accordingly, we reverse Williams' convictions for ineffective assistance of counsel.

While Williams' trial counsel's performance was clearly deficient, Williams' counsel is not the only party to blame, for the State systematically elicited improper testimony and other evidence and ultimately encouraged the jury to convict Williams on that basis. The State objected on several occasions when Williams' trial counsel attempted to elicit testimony during cross-examination of two of the State's witnesses – Peek and Tate – about their prior bad acts that also fell within the types of testimony precluded under Rule 404(b). Yet the State in its own examinations sought and obtained testimony repeatedly about Williams' prior bad acts – evidence that clearly should have been excluded under Rule 404(b).

Thus, Williams was deprived not only of effective assistance of counsel, but also of a fair trial. The conduct of trial counsel for both parties was sufficiently problematic to meet the higher bar required for reversal of Williams' convictions under the doctrine of fundamental error. *See Benefield v. State*, 945 N.E.2d 791, 802-05 (Ind. Ct. App. 2011) (citing, inter alia, *Jewell v. State*, 887 N.E.2d 939 (Ind. 2008); *Rouster v. State*, 705 N.E.2d 999 (Ind. 1999)) (recognizing a distinction between the standards for ineffective assistance of counsel and for fundamental error, and recognizing that fundamental error

12

occurs when a fair trial is rendered impossible and not merely where trial counsel is ineffective), *trans. denied*.

## II. Sufficiency of the Evidence

We next must determine if it is permissible to retry Williams on these charges. Double jeopardy prohibits a person "for the same offence to be twice put in jeopardy of life or limb." *United States v. Dixon*, 509 U.S. 688, 695-96 (1993). However, this "prohibition against successive prosecutions does not prevent the government from retrying a defendant who succeeds in getting his first conviction set aside . . . because of some error in the proceedings leading to conviction." *Berry v. State*, 725 N.E.2d 939, 944 (Ind. Ct. App. 2000). All evidence admitted by the trial court is considered, including erroneously admitted evidence, and "[i]f that evidence as a whole would have been sufficient to sustain the judgment, double jeopardy does not attach." *Id.*

### A. Burglary

Indiana Code section 35-43-2-1(1) governs Class B felony burglary and provides:

A person who breaks and enters the building or structure of another person, with intent to commit a felony in it, commits burglary, a Class C felony. However, the offense is:
(1) a Class B felony if:
(A) it is committed while armed with a deadly weapon . . . .

Williams contends that the State failed to prove that he intended to commit a theft after he broke into Peek's house. We disagree, and find that there would have been sufficient evidence to sustain Williams' burglary conviction.

The "intent to commit a specific felony at the time of the breaking and entering may be inferred from the circumstances." *Baker v. State*, 968 N.E.2d 227, 229-30 (Ind.

13

2012) (internal quotations omitted). The evidence showing the intent to commit a felony "need not be insurmountable, but there must be a specific fact that provides a solid basis to support a reasonable inference that the defendant had the specific intent to commit a felony." *Id.* at 230 (internal quotations omitted).

The evidence most favorable to the State adduced at trial shows that Williams discussed with Tate breaking into Peek's house and stealing money, marijuana, and guns in November 2011. Tr. p. 175-76. On the day of the burglary, when the men got to the house, Williams kicked open the service door to the garage and entered Peek's house with the intent to steal from Peek. *Id.* at 178-83. Once inside the house, Williams touched and moved Peek's property, as Peek only realized that someone was inside his house when he heard chairs in the kitchen moving over the ceramic-tile floor. *Id.* at 38. Finally, when Peek ran downstairs to see what was going on, Williams fled from the house, jumped a fence at the back of Peek's property, and continued running.

As a whole, this evidence would have been sufficient to sustain Williams' burglary conviction, so we find that retrial on this charge is permissible.

*B. Conspiracy to Commit Burglary*

Williams also contends that there is insufficient evidence to sustain his conspiracy to commit burglary conviction. Indiana Code section 35-41-5-2 governs conspiracy and provides in relevant part:

> (a) A person conspires to commit a felony when, with intent to commit the felony, he agrees with another person to commit the felony . . . .

> (b) The State must allege and prove that either the person or the person with whom he agreed performed an overt act in furtherance of the agreement.

14

At trial, evidence was presented that a month before the burglary, Williams and Tate discussed a plan to steal marijuana, money, and guns from Peek's house. Tr. p. 175-76. Then, on the day of the burglary, Williams told Tate that they had to go, *id.* at 177, and threatened to "beat [Tate's] ass" when Tate hesitated to go along with the plan. *Id.* at 128. If the fact-finder believes Tate, this is sufficient evidence to show that Williams agreed to commit the burglary with Tate.

As discussed above, there was also sufficient evidence to show that Williams performed an overt act in furtherance of his agreement with Tate to commit the burglary. After driving to Peek's house, Williams kicked open the service door to the garage and entered the house. He then touched and moved Peek's property once inside. We therefore find that there would have been sufficient evidence to sustain Williams' conspiracy to commit burglary conviction.

*C. Carrying a Handgun without a License*

Indiana Code section 35-47-2-1 governs the offense of carrying a handgun without a license and states in relevant part:

> (a) Except as provided in subsections (b) and (c) and section 2 of this chapter, a person shall not carry a handgun in any vehicle or on or about the person's body without being licensed under this chapter to carry a handgun.

The offense is a Class A misdemeanor unless the defendant has been convicted of a felony within fifteen years before the immediate offense, and then it is a Class C felony. Ind. Code § 35-47-2-23(2)(B). Williams admitted that he had been convicted of a felony within the past fifteen years. He contends, however, that the State failed to prove that he carried a handgun. We disagree.

15

Williams' argument focuses on the fact that only Peek claims that Williams had a handgun.  Williams argues that the police never found a gun and no witness, other than Peek, placed a gun in Williams' hand.  Regardless, with Peek's testimony, the evidence was sufficient to sustain a conviction of carrying a handgun without a license.  We therefore hold that retrial is permissible on all three charges.

Reversed and remanded.

BAILEY, J., and BROWN, J., concur.