**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Aug 02 2013, 6:23 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**STEPHEN T. OWENS**
Public Defender of Indiana

**KRISTEN E. PHAIR**
Deputy Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JUSTIN F. ROEBEL**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

DWAYNE KELLY,                                )
                                             )
    Appellant-Petitioner,            )
                                             )
      vs.                        )   No. 27A01-1212-PC-568
                                             )
STATE OF INDIANA,                            )
                                             )
    Appellee-Respondent.             )

APPEAL FROM THE GRANT CIRCUIT COURT
The Honorable Mark E. Spitzer, Judge
Cause No. 27C01-0904-PC-2

**August 2, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**SHARPNACK, Senior Judge**

STATEMENT OF THE CASE

Dwayne Kelly appeals the denial of his petition for post-conviction relief. We affirm.

ISSUES

Kelly raises two issues: (1) whether he received ineffective assistance of trial counsel and (2) whether he received ineffective assistance of appellate counsel.

FACTS AND PROCEDURAL HISTORY

The underlying facts of this case, taken from this Court's memorandum decision in Kelly's direct appeal, are as follows:

> On March 4, 2005, Kelly went to Heather Jones's house in Marion, Indiana, looking for Alonzo Coleman. Steffan Bobson and several friends were already at Jones's house. When Kelly entered the house, Bobson was sleeping on the couch with a gun in his lap. Kelly took the gun from Bobson's lap and asked who owned the gun. One of Bobson's friends testified that Kelly cocked the gun and pointed it at his legs. Despite being urged by several of the people present to return the gun to Bobson, Kelly left with the gun. Kelly testified that he unloaded the gun and hid it after he left Jones's house.
>
> The following day, Kelly went to Antoinette Sanders's house looking for Coleman. While Kelly was at Sanders's house, Bobson arrived. Bobson yelled at Kelly to return his gun and acted as if he was going to hit Kelly. Kelly jumped, causing onlookers to laugh. Kelly then left and retrieved Bobson's gun from its hiding place. Kelly told his friends that he was going back to the house to "deal with him," [Tr. p. 243[1]], or to "settle the problem," *id.* at 262.
>
> Not long after he first left Sanders's house, Kelly returned and knocked on the door. When Bobson answered, Kelly said, "Let me holler at you." *Id.* at 665. Bobson partially shut the door and walked away, but Kelly entered the house while holding the gun in his hand. Kelly raised the gun and pointed it at Bobson. Kelly and Bobson struggled over the gun. During the struggle, Bobson was shot and eventually died from a "loose

---

[1] We refer to the transcript from Kelly's jury trial as "Tr." and the transcript from his post-conviction hearing as "PCR Tr."

2

contact gun shot wound" to the chest. *Id.* at 553. Kelly testified that it was a "surprise" to him when the gun went off because he thought it was unloaded. *Id.* at 667.

After the shooting, Kelly took the gun and walked away from the scene. He gave the coat he was wearing to a friend's nephew and told him to wash it. He borrowed a change of clothes and arranged a ride to Chicago with friends. He told one of his friends that "he didn't mean[ ] for it to happen like that, he meant . . . to put him in the wheelchair." *Id.* at 536.

Kelly was eventually arrested and charged with murder. Kelly testified on his own behalf at his jury trial, admitting to much of the State's evidence, but claiming that he believed the gun was unloaded, that he did not have the gun in his hand when he entered Sanders's house, and that he does not know who pulled the trigger during the struggle for the gun. The jury was instructed on the elements of murder as well as the elements of the lesser-included offenses of voluntary manslaughter, involuntary manslaughter, and reckless homicide. The jury found Kelly guilty of murder.

*Kelly v. State*, No. 27A05-0610-CR-590, slip op. at 2-3 (Ind. Ct. App. Mar. 28, 2008).

The trial court sentenced Kelly to sixty-five years.

On direct appeal, Kelly, represented by the same counsel as at trial, argued that the evidence was insufficient to sustain his conviction and that the trial court abused its discretion in sentencing him. Concluding that the evidence was sufficient and that any sentencing error was harmless, we affirmed. *Id.* at 10.

In an amended post-conviction petition, Kelly, by counsel, argued that he received ineffective assistance of trial and appellate counsel. After a hearing, the court denied the petition for post-conviction relief. Kelly now appeals.

DISCUSSION AND DECISION

In a post-conviction proceeding, the petitioner bears the burden of establishing grounds for relief by a preponderance of the evidence. Ind. Post-Conviction Rule 1(5); *Henley v. State*, 881 N.E.2d 639, 643 (Ind. 2008). When appealing the denial of post-

3

conviction relief, the petitioner stands in the position of one appealing from a negative judgment. *Henley*, 881 N.E.2d at 643. The reviewing court will not reverse the judgment unless the petitioner shows that the evidence as a whole leads unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court. *Id.* at 643-44. Further, the post-conviction court in this case made findings of fact and conclusions of law in accordance with Indiana Post-Conviction Rule 1(6). We will reverse a post-conviction court's findings and judgment only upon a showing of clear error, which is that which leaves us with a definite and firm conviction that a mistake has been made. *Id.* at 644. The post-conviction court is the sole judge of the weight of the evidence and the credibility of the witnesses. *Fisher v. State*, 810 N.E.2d 674, 679 (Ind. 2004). We accept findings of fact unless clearly erroneous, but we accord no deference to conclusions of law. *Id.*

Kelly claims that: (1) trial counsel was ineffective by opening the door to prejudicial character evidence; (2) trial counsel was ineffective by failing to object on foundation grounds to evidence that witnesses had been threatened; and (3) appellate counsel was ineffective by failing to challenge the admission of the threat evidence.

To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate that counsel's performance was deficient and that the petitioner was prejudiced by the deficient performance. *Ben-Yisrayl v. State*, 729 N.E.2d 102, 106 (Ind. 2000) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). If we can dismiss an ineffective assistance claim on the prejudice prong, we need not address whether counsel's performance was deficient. *Helton v. State*, 907

4

N.E.2d 1020, 1023 (Ind. 2009). To prove prejudice, the petitioner must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

We find the prejudice issue dispositive and thus do not address the alleged deficiencies in counsel's performance.

## I. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

Kelly contends trial counsel was ineffective by opening the door to prejudicial character evidence. Indiana Evidence Rule 404(b) provides in relevant part, "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Even so, otherwise inadmissible evidence may be admitted where a defendant opens the door to questioning on that evidence. *Clark v. State*, 915 N.E.2d 126, 130 (Ind. 2009). When a defendant offers evidence of his own character, he opens the door to the subject of his character for the trait placed in issue. *Berkley v. State*, 501 N.E.2d 399, 400 (Ind. 1986).

At trial, defense counsel questioned Gina Wilcox on direct examination about Kelly's reputation for peacefulness in the community, to which she said, "He's really nice to me." Tr. p. 631. When asked whether she had ever known him to be a violent man, she responded, "Never." *Id.*

During the State's cross examination, Wilcox said she did not know anything about Kelly committing batteries:

5

Q        If he had attacked and battered a girlfriend on occasion, you didn't know anything about that?

A        No, sir.

Q        If he'd been arrested and convicted of multiple batteries on Jackie Sanders, you didn't know anything about that?

A        No, sir.

Q        He never threatened you or battered you?

A        No. If he did I['d] tell ya.

*Id.* at 635. The State later elicited evidence of prior bad acts from Kelly:

Q        Now, about your peacefulness, you do acknowledge that you[ ] have criminal records for beating up your girlfriend, correct?

A        Yes.

Q        Smashing her in the mouth and kicking her . . .

[Defense counsel objects, and the objection is sustained. In a sidebar, the trial court and the State discuss the permissible scope of questions.]

Q        You were convicted of battering Jackie Sanders back in '94, isn't that right?

A        Yes.

Q        Of course that was Antonio Shaw who was convicted of that, right?

A        That's the alias that I use.

Q        And how many aliases do you have?

A        Probably about eleven.

Q        Can you help us understand why you have eleven aliases?

A        I had a warrant at the time and I was tryin' to get around it.

Q        Well, that may explain one alias, why did you have eleven?

A        I was tryin' to get back without my name showin' up, so my bond could be lowered.

Q        [Y]our name showed up in '95 when you were convicted of battering her again, is that correct?

A        Yes.

Q        And it was under the name of Dwayne Kelly that you were convicted in '96, a third time of battering her.

A        No.

Q        Was that another victim?

A        No, they dismissed that, because she told 'em I didn't hit her and they dismissed that.

6

*Id.* at 682-85. The State's challenge to Kelly's peacefulness thus established that he used several aliases and had two battery convictions from over a decade before the 2006 trial.

Kelly also contends trial counsel was ineffective by failing to object on foundation grounds to evidence that two witnesses had been threatened. Because threats tend to show guilt on the part of a defendant, a proper foundation must be laid to show that the threats were made by the defendant or by some third party with the defendant's knowledge or authorization. *Kimble v. State*, 451 N.E.2d 302, 306 (Ind. 1983).

Kelly argues trial counsel should have objected on foundation grounds during the testimony of Antoinette Sanders and Latea Ford. On direct examination, the State asked Sanders why she left town a few days after the shooting. Sanders responded:

> A     Because I was receivin' threatening messages that if I tell or if I go to Court then me and my kids . . .
>       BY [DEFENSE COUNSEL]: I'm gonna object to what she was told, unless they bring in those people that made those threats so that I can cross examine them.
>       BY THE COURT: Over[r]uled.
> Q     You can answer.
> A     I was threatened that if I came to Court or if [I] told what happened that me and my kids, somethin' was gonna happen to me and my kids, so I left and it was just like embarrassin' to me[ ] that this happened in my house, so I left.

Tr. p. 293. Ford testified that she was concerned but had not received any threats:

> Q     Latea, . . . did you have concerns about comin' to court?
> A     Yes.
> Q     After this all happened, have you had any threats about comin' to Court?
> A     No, I haven't received any threats, but I received people axin' [sic] me if I'm goin' to Court, was I goin' to Court, what I was gonna say in Court.
> Q     Did someone come to your home?
> A     Yes.

7

Q    Who was that?
A    Somebody named Jay, I guess he was in jail, I really don't know him.
Q    And what was that about?
A    He just axed [sic] me, was I goin' to Court and said that Dwa[ ]yne wanted me . . .

    BY [DEFENSE COUNSEL]: I'm gonna object to what Jay said, unless he's called as a witness.

    BY THE COURT: Sustained.

Q    What was your response after this person come [sic] to your home?

    BY [DEFENSE COUNSEL]: I'm gonna object, relevancy.

    BY [THE STATE]: Your Honor, I think it goes to . . .

    BY THE COURT: Overruled.

Q    You may answer, Latea.
A    Not come to my house and I really didn't wanna talk to 'em about it.
Q    Did it concern you that he came to your home?
A    Yes, cause I really didn't know what was gonna happen, I didn't know if he was just comin' there to be concerned or, you know, I have a son, and I didn't want nothin' to happen to me or my baby, so yeah I was concerned.

*Id.* at 313-14. The State thus elicited evidence that Sanders was threatened by some unspecified party and that Ford was concerned when someone named Jay went to her house and asked her about going to court.

Even if defense counsel's performance was deficient, Kelly still must establish prejudice. At the post-conviction hearing, defense counsel testified that the defense strategy was for Kelly to admit certain matters "that shed some bad light on" him because it would show the jury he was being truthful. PCR Tr. p. 12. Indeed, Kelly testified at trial that he sold cocaine and carried a gun because of his drug activities. Tr. pp. 645-46. At the time he stole Bobson's gun, he was carrying his own gun and had another gun in his car. *Id.* at 651. Kelly's own testimony demonstrated that he was, in the words of the post-conviction court, "a gun[-]carrying out-of-town drug dealer, drug user, and thief."

8

Appellant's App. p. 92. That any consequences of defense counsel's alleged deficient performance significantly affected the jury's perception of Kelly is unlikely.

Moreover, the State's evidence was strong. When Bobson confronted Kelly about stealing his gun, Bobson acted as if he was going to hit Kelly, which caused him to jump and onlookers to laugh. Kelly was "mad" after the incident and said he was going to "[g]o back and deal with him." Tr. p. 243. When Kelly went back, he knocked on the door. Bobson answered, and Kelly said, "[L]et me holler at you, you want me to put somethin' in ya[?]" *Id.* at 312. Bobson turned and walked away. Kelly followed him and "put a gun to the back of [Bobson's] head." *Id.* at 307. Latea Ford and Candice Jones, the only other people in the room when Kelly walked into the house, each testified that Kelly pointed the gun at Bobson.[2] *Id.* at 307, 378. When Bobson realized Kelly had the gun at his head, the two struggled for the gun. During the struggle, Bobson was fatally shot. Kelly left the scene with the gun, gave his jacket to a friend's nephew with instructions to wash it, found a ride to Chicago with friends, and told one of those friends that he only meant to put Bobson in a wheelchair.

Kelly nonetheless argues that he refuted much of the State's evidence of his intent, and had the jury not heard evidence of his aliases, convictions, and threats, it would have found him not guilty of murder. We disagree. Kelly's version of events was that he thought the gun was unloaded because he had emptied the magazine and did not realize a round could still be in the chamber. According to Kelly, he went to return the gun, but when he lifted his shirt to show it to Bobson, Bobson reached for it. Kelly explained that

---

[2] The two women ran out of the house before the gun discharged.

9

during the ensuing struggle, which lasted several minutes, Bobson hit him in the jaw and hit him in the back of the head with a lamp before the gun went off. They then continued to wrestle until Bobson told Kelly several times that he was getting weak. Kelly then left the house with the gun. Kelly's testimony was extensively cross-examined by the State.

First, it is unclear why Kelly would have tried so hard to hang on to a gun he intended to return and believed to be unloaded. More importantly, though, as noted above, the jury's estimation of Kelly's character was not likely further damaged by any deficient performance in light of his admissions to being a drug dealer and a thief, to using drugs, and to carrying firearms. In addition, several different witnesses provided evidence of his intent to kill. Our review of the record easily persuades us that, even without the challenged evidence, the outcome of the trial would have been the same.

Kelly also argues this case is like *Williams v. State*, 983 N.E.2d 661 (Ind. Ct. App. 2013), where defense counsel's failure to object to evidence of Williams's prior criminal acts prejudiced him and warranted a new trial. Williams was charged with burglary, conspiracy to commit burglary, and carrying a handgun without a license. At his jury trial, evidence of several of his prior criminal acts was admitted without objection:

- That he had been charged with five counts of drug and gun charges, pleaded guilty to Class C felony possession of cocaine and a firearm, and was placed on home detention.
- That while on home detention, community corrections officers searched his home and found him in possession of cocaine, heroin, and more than one gun.
- That he had admitted to law enforcement that he had committed previous unspecified burglaries, robberies, and gun-trafficking offenses.
- That he had previously possessed heroin, firearms, and a stolen Indianapolis Metropolitan Police Department taser.

10

During closing argument, the State explicitly asked the jury to infer that his prior criminal behavior indicated his guilt on the charged crimes. On appeal, this Court found counsel's performance deficient. In finding prejudice, the Court noted that the deficient performance caused the jury to learn of Williams's extensive criminal background, which included burglary and illegal gun possession, the very crimes to be evaluated by the jury.

Here, the jury did not learn of an extensive criminal background. Instead, it learned only of decade-old battery convictions and Kelly's use of several aliases, bad acts which are not similar to murder. Moreover, unlike in *Williams*, the State did not emphasize or even allude to these prior bad acts in closing. We therefore find *Williams* distinguishable.

In light of the overwhelming evidence of guilt as well as the bad acts evidence Kelly does not challenge, we hardly think his use of aliases, stale battery convictions, and evidence of threats to witnesses undermines any confidence in the guilty verdict. Without prejudice, Kelly's claim of ineffective assistance of trial counsel fails.

## II. INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

Kelly next contends appellate counsel was ineffective by failing to challenge the admission of the threat evidence. As noted above, however, the evidence of Kelly's guilt was overwhelming even without this evidence. Its admission therefore did not deprive him of a fair trial. Thus, even if Kelly had raised the issue, he would not have prevailed.

11

## CONCLUSION

We cannot say that the evidence as a whole leads unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court. We therefore affirm the denial of post-conviction relief.

Affirmed.

KIRSCH, J., and BAILEY, J., concur.