## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 25 2016, 8:49 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jack Quirk
Muncie, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Jodi Kathryn Stein
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| William Verlin Martz, *Appellant-Defendant,* | August 25, 2016 |
| | Court of Appeals Case No. 18A02-1601-CR-121 |
| v. | Appeal from the Delaware Circuit Court |
| | The Honorable Linda Ralu Wolf, Judge |
| State of Indiana, *Appellee-Plaintiff.* | Trial Court Cause No. 18C03-1401-MR-1 |

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Defendant, William V. Martz (Martz), appeals his conviction for murder, a felony, Ind. Code § 35-42-1-1(1) (2013).

We affirm.

## ISSUES

Martz raises two issues on appeal, which we restate as follows:

(1) Whether Martz received ineffective assistance of trial counsel based on his attorney's failure to object to certain hearsay testimony; and

(2) Whether the State engaged in prosecutorial misconduct.

## FACTS AND PROCEDURAL HISTORY

Mark Gilland (Gilland) owned a parcel of property located at 503 East Race Street in Eaton, Delaware County, Indiana (Property). Although Gilland did not personally live on the Property, he kept a substantial number of his possessions in a pole barn on the Property. The Property also contained several other outbuildings and a small cabin in which his nephew, Greg Gilland (Greg), resided. Gilland was frequently present at the Property to fish in the river, cut wood, and work on other projects.

Gilland and Martz had been friends for most of their lives. At some point in 2012, Martz lost his housing. As a result, Gilland gave Martz a pull-behind travel trailer—*i.e.*, a camper, which he allowed Martz to park on the Property. In lieu of rent, Gilland asked Martz to help out with various chores around the

Property. Gilland provided Martz with heat by piping it in from the wood stove in the pole barn, as well as electricity.

[6] In December of 2013, Martz had been living on the Property for approximately eighteen months, and his relationship with Gilland was deteriorating. Around this time, Gilland informed Martz that he needed to vacate the Property within thirty days. Martz, however, claimed that Gilland owed him $6,500 for some construction work he had purportedly done, and he refused to leave until he was paid. In approximately mid-December 2013, Martz informed his friend, Lester Bailey (Bailey), that Gilland had cut off the electricity to his camper. Martz also stated that he had found Gilland's handgun. Martz announced that he was "going to kill that son of a bitch." (Tr. p. 34). Bailey, who had known Gilland for twenty years and was the brother of Gilland's fiancée, advised Martz "to leave it alone." (Tr. p. 34). One week later, Martz was cutting wood with Bailey and was "[i]n an uproar" about the fact that Gilland wanted him off the Property. (Tr. p. 37). Again, Martz threatened that he "was going to kill [Gilland]." (Tr. p. 37). Bailey tried to convince Martz that "[h]e needed to make up with [Gilland]" because of their longstanding friendship, but Martz said he was "[n]ot doing it." (Tr. p. 38). When Bailey stated that "they will just lock you up the rest of your life[,]" Martz responded that he would then "have a place to stay." (Tr. p. 38).

[7] By January of 2014, Gilland had repeatedly asked Martz to leave the Property, to no avail. Gilland had numerous conversations with his fiancée, Terri Ashcraft (Ashcraft), and several of his siblings about his arguments with Martz

and his futile attempts to evict him. Gilland's sister, Sheryl Grant (Grant), invited Martz to relocate the camper onto her property. However, Grant and Martz subsequently had an argument about some repair work that Martz had previously done in Grant's home, so Martz did not accept her offer. Gilland determined that he was going to remove Martz' camper on Saturday, January 11, 2014. During the week leading up to the eviction date, Gilland informed his brother, Michael Gilland (Michael); his sister, Valerie Dalton (Dalton); and Ashcraft of his intent to oust Martz. On the evening of January 10, 2014, Gilland reported to Ashcraft that Martz had threatened to shoot him if he forced Martz to move off the Property.

[8] On January 11, 2014, between 10:30 a.m. and 11:00 a.m., Gilland departed the house he shared with Ashcraft, located just outside of Eaton. Gilland had informed Ashcraft before leaving that he was heading to the Property to evict Martz and that he planned to spend the rest of the day watching football with his family. Although Ashcraft did not know what time she could expect Gilland to return home, she counted on the fact that he always called to check in with her.

[9] Later that day, at approximately 12:15 p.m., Stephanie Morrison (Morrison) was outside shoveling snow at her mother's house, which is located across the street from Gilland's Property. Morrison heard five gunshots ring out from the direction of the Property, and she "ducked" for cover because the shots were "very close." (Tr. p. 92). Morrison did not see anyone else outside, but she determined that it was too dangerous to continue shoveling snow. After she

stepped into her mother's garage, Morrison heard a truck drive by, which sounded to her like Gilland's truck. A short time later, between 12:20 and 12:25 p.m., Jarret Upchurch (Upchurch), another Eaton resident and friend of Gilland, was returning to Eaton after making a trip to the scrapyard in Hartford City, Indiana. He observed Gilland's distinctive white pickup truck—a late model, half-ton Chevrolet "with a white bow-tie headache rack covering the back window" and a missing tailgate—heading in the opposite direction, out of town. (Tr. p. 102). When Upchurch raised his hand to wave at Gilland, he clearly observed that Martz was driving Gilland's truck, and there were no other passengers. Martz drove Gilland's truck to Muncie, Indiana, and used cash to rent a motel room at the Red Carpet Inn. Martz also purchased food at Taco Bell and shampoo at Walmart.

[10] By 6:30 p.m., Ashcraft had not heard from Gilland, and she grew concerned. Ashcraft checked with Gilland's siblings, who reported that they had not seen Gilland at all that day. Based on the fact that Gilland had indicated that he was heading to the Property earlier that morning and had not been seen since, Ashcraft and Grant each drove by the Property at some point but did not see Gilland's truck. Ashcraft also drove around town but did not see Gilland's truck at any of the places she would expect to find him. Grant contacted their nephew, Greg, who lived in the cabin on the Property. Greg reported that he had been home since 12:30 p.m. and had not seen Gilland. Greg went out to Martz' camper "and beat on the back of it to see if he had seen anything or to see if he was around." (Tr. p. 144). Martz did not respond. Greg searched

around the Property, with the exception of the pole barn, which was locked, but did not find Gilland.

[11] Between 8:30 p.m. and 9:15 p.m., Ashcraft, Greg, and four of Gilland's siblings—Michael, Dalton, Grant, and Doug Gilland (Doug)—convened at the Property. Doug observed that Martz' camper had been padlocked from the outside. Doug managed to pry the padlock off and entered the camper, but he did not find anything noteworthy. Next, Doug forced his way into the locked pole barn and, by the light of his flashlight, found Gilland's lifeless body lying in a pool of blood. Doug screamed out that Gilland was dead, and after Michael went into the barn to confirm that Gilland was not breathing, they notified law enforcement. Near Gilland's body, officers recovered the .380 caliber semi-automatic pistol that Gilland had inherited from his father. The magazine, which had the capacity to hold five cartridges, was empty. Five shell casings were found at the scene, as well as a spent bullet and another bullet fragment. Based on the fact that Gilland's face was soaked with blood, along with his position in proximity to a large pool of blood, it appeared that Gilland had initially fallen face down on the concrete and that someone had rolled his body over. Gilland's jacket pocket was turned inside out, and his keys were missing. Gilland's wallet was found on the ground right next to him. Although it still contained his identification and other cards, the wallet did not have any cash, which was unusual for Gilland. Investigating officers also discovered that Gilland had a pocketknife in his front pocket and a large survival-type knife in his back pocket, which was still secured in its sheath.

[12]    Based on the information provided to law enforcement by Ashcraft and Gilland's siblings, Martz was immediately identified as a suspect. Officers throughout Delaware County were notified to be on the lookout for Martz and Gilland's missing truck. At approximately 12:30 a.m. on January 12, 2014, Sergeant Jay Turner (Sergeant Turner) of the Muncie Police Department began searching hotels for Martz. At Sergeant Turner's first stop, the Red Carpet Inn, he spotted a white pickup truck in the parking lot matching the description of Gilland's vehicle. Sergeant Turner checked the license plate number and verified that the truck was indeed Gilland's. The motel manager confirmed that Martz had checked into Room 129 at 1:15 p.m. the previous day. Thus, Sergeant Turner summoned other officers for backup, and they knocked on the door of Room 129. Martz answered and was immediately arrested. In Martz' motel room, Sergeant Walter Blackmer of the Delaware County Sheriff's Department found Gilland's truck key as well as a key to the pole barn. After taking Martz into custody, officers obtained a sample of his DNA.

[13]    On January 13, 2014, Dr. Paul Mellen (Dr. Mellen) conducted an autopsy on Gilland. Dr. Mellen concluded that the cause of Gilland's death was "multiple gunshot wounds[,]" and the manner of his death was a homicide. (Tr. p. 301). Dr. Mellen elaborated that Gilland sustained a total of six gunshot wounds. Specifically, Gilland was shot in the top of his head and at close range on the right side of his forehead. Dr. Mellen opined that either one of these shots alone would have been fatal. Gilland also received a grazing gunshot wound to his neck, and he was shot through the forearm, in the torso, and in the leg.

Although there were six different gunshot wounds, Dr. Mellen testified that it was likely that the wound to the forearm and the torso were the result of the same bullet.

[14] The .380 firearm found at the crime scene, which belonged to Gilland, as well as the casings and bullets recovered from both the floor of the pole barn and Gilland's body during the autopsy, were submitted to the Indiana State Police Laboratory for testing. A forensic firearms examiner testified that the bullets and casings were fired from Gilland's gun. In addition, a DNA analyst testified that Gilland's DNA was found on the muzzle of the .380, and she found Martz' DNA on the gun's slide, grip, safety mechanism, trigger and trigger guard, and magazine.

[15] On January 17, 2014, the State filed an Information, charging Martz with one Count of murder, a felony, I.C. § 35-42-1-1(1) (2013). On November 16 through 18, 2015, the trial court conducted a jury trial. At the close of the evidence, the jury returned a guilty verdict. On December 17, 2015, the trial court held a sentencing hearing and ordered Martz to serve sixty years in the Indiana Department of Correction.

[16] Martz now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Ineffective Assistance of Counsel*

[17] Martz claims that he received ineffective assistance of counsel based on his attorney's failure to object to multiple instances of hearsay in the testimony of

Ashcraft, Dalton, Grant, and Michael.[1]  In order to establish a valid claim for ineffective assistance of counsel, the appellant "must demonstrate both that his counsel's performance was deficient and that the [appellant] was prejudiced by the deficient performance."  *Williams v. State*, 983 N.E.2d 661, 665 (Ind. Ct. App. 2013) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).  "Failure to satisfy either prong will cause the claim to fail."  *Id.*

[18]  Counsel's performance is deficient if it "fell below an objective standard of reasonableness based on prevailing professional norms."  *Morgan v. State*, 755 N.E.2d 1070, 1072 (Ind. 2001).  It is well established that counsel is to be afforded "'considerable discretion in choosing strategy and tactics, and we will accord that decision deference.  A strong presumption arises that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'"  *Id.* at 1073 (quoting *Lambert v. State*, 743 N.E.2d 719, 730 (Ind. 2001)).  For deficient performance to be found prejudicial, the appellant must show "that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"  *Id.* at 1072-73 (quoting *Strickland*, 466 U.S. at 687).  "[A]

---

[1] We note that Martz has raised his claim of ineffective assistance of counsel on direct appeal even though "[a] postconviction hearing is normally the preferred forum to adjudicate an ineffectiveness claim.'" *Morgan v. State*, 755 N.E.2d 1070, 1072 n.2 (Ind. 2001) (quoting *Woods v. State*, 701 N.E.2d 1208, 1219 (Ind. 1998), *cert. denied*, 528 U.S. 861 (1999)).  As our supreme court has stated, "raising claims of ineffective assistance of counsel on direct appeal precludes their review in subsequent post-conviction proceedings." *Id.*

reasonable probability is a probability sufficient to undermine the confidence in the outcome." *Id.* at 1073 (quoting *Lambert*, 743 N.E.2d at 730).

[19] In this case, Martz contends that numerous hearsay statements were admitted into evidence without any objection from his attorney. "Hearsay" is defined as "a statement that: (1) is not made by the declarant while testifying at the trial or hearing; and (2) is offered in evidence to prove the truth of the matter asserted." Ind. Evidence Rule 801(c). Unless one of the specifically delineated exceptions set forth in Evidence Rule 803 applies, hearsay is inadmissible. Evid. R. 802. "'[T]o prevail on a claim of ineffective assistance due to the failure to object [to hearsay], the defendant must show an objection would have been sustained if made.'" *Benefield v. State*, 945 N.E.2d 791, 799 (Ind. Ct. App. 2011).

[20] Martz points to Ashcraft's testimony, during which she discussed multiple conversations that she had with Gilland prior to his death regarding the specific nature of Gilland's arguments with Martz, Martz' demand for $6,500, and Gilland's attempts to evict Martz from the Property. In particular, Ashcraft testified that on the night before his death, Gilland stated that Martz had threatened to shoot him if he evicted Martz. Similarly, Martz directs our attention to the testimony of Dalton, Grant, and Michael, who all repeated their conversations with Gilland about his plans to evict Martz from the Property. According to Martz, by failing to object to this hearsay, his attorney was ineffective. He further argues that his attorney's deficient performance was prejudicial because if his attorney had objected,

the jury would not have known about the conflict between [Martz] and [Gilland]. The jury would not have known that [Gilland] was going to confront [Martz] on the day of his death at the [Property]. Without the information the jury would have known that there was a conflict and a threat four weeks prior but would not have known that [Martz] had possibly been confronted on the day of [Gilland's] death.

(Appellant's Br. p. 12).

[21] We first note that Martz has failed to set forth the applicable standard for ineffective assistance of counsel. Ind. Appellate Rule 46(A)(8)(b). Additionally, Martz has failed to develop a cogent argument establishing that the statements at issue constitute inadmissible hearsay—in other words, that an objection to the statements based on hearsay, if made, would have been sustained. App. R. 46(A)(8)(a); *see Benefield*, 945 N.E.2d at 799. Instead, Martz has waived this issue by baldly asserting that hearsay was improperly admitted due to his counsel's ineffectiveness and that this deficient performance was prejudicial to the outcome of his case.

[22] Waiver notwithstanding, we find that Martz has failed to establish that he was prejudiced by his attorney's failure to object. *See Helton v. State*, 907 N.E.2d 1020, 1023 (Ind. 2009) ("If we can dismiss an ineffective assistance claim on the prejudice prong, we need not address whether counsel's performance was deficient."). Even assuming, without deciding, that the statements at issue made by Ashcraft, Dalton, Grant, and Michael would have been excluded as

inadmissible hearsay, the remaining evidence overwhelmingly supports Martz'
conviction for murder.

[23]     Approximately four weeks prior to the murder, Martz informed Bailey that
Gilland had threatened to evict Martz from the Property. Martz indicated that
he had found Gilland's handgun and that he was "going to kill that son of a
bitch." (Tr. p. 34). Then, about three weeks prior to the murder, Martz had
another conversation with Bailey, during which Martz was "[i]n an uproar"
because Gilland "want[ed] [Martz] off the [P]roperty." (Tr. p. 37). Martz
again stated that "he was going to kill [Gilland]." (Tr. p. 37). When Bailey
reminded Martz that he would be sent to prison for such an act, Martz was not
dissuaded because at least he would "have a place to stay." (Tr. p. 38). On the
day of the murder, around 12:15 p.m., Morrison heard five gunshots emanate
from the Property, followed by the sound of what she believed to be Gilland's
truck leaving the Property. About ten minutes later, Upchurch observed Martz,
alone, driving Gilland's truck. By 1:15 p.m., Martz had driven to Muncie and
rented a room at the Red Carpet Inn. Martz also purchased shampoo from
Walmart at 1:37 p.m. After Sergeant Turner discovered Gilland's truck in the
parking lot of the Red Carpet Inn, officers entered Martz' motel room and
discovered the keys to Gilland's truck and to the pole barn. The evidence
establishes that when Gilland's family was searching for him, they were unable
to access the pole barn because only Gilland possessed a key. When Gilland's
body was found in the locked pole barn, his jacket pocket had been turned
inside out, and his keys were missing.

Furthermore, the forensic firearms examiner concluded that the bullets recovered from Gilland's body and from the crime scene had been fired from Gilland's own .380 semiautomatic handgun. A DNA analyst testified that Gilland's DNA was found on "the outermost surface of the muzzle end [of the firearm]." (Tr. p. 347). However, Martz' DNA was present on the gun's slide, grip, safety mechanism, trigger and trigger guard, and the magazine. Accordingly, based on all of the other evidence establishing Martz' guilt, we find that he has failed to establish that there is a reasonable probability that but for his counsel's failure to object to the hearsay statements, the outcome of this case would have been different.

## II. *Prosecutorial Misconduct*

Martz next claims that the State engaged in prosecutorial misconduct. In particular, Martz asserts that the State's reference to Gilland's death as a "murder" during the examination of a witness was prejudicial. (Tr. p. 36). In order "[t]o preserve a claim of prosecutorial misconduct, the defendant must—at the time the alleged misconduct occurs—request an admonishment to the jury, and if further relief is desired, move for a mistrial." *Ryan v. State*, 9 N.E.3d 663, 667 (Ind. 2014). In this case, Martz objected to the use of the word murder, and he requested a continuing objection; however, Martz did not request an admonishment or move for a mistrial. As a result, Martz has procedurally defaulted on this issue "for failure to properly raise the claim in the

trial court." *Id.*[2] However, such a procedural default does not foreclose our review. Rather, in order to prevail upon this claim, Martz "must establish not only the grounds for prosecutorial misconduct but must also establish that the prosecutorial misconduct constituted fundamental error." *Id.* at 668.

[26]     Martz refers us to the following colloquy during the State's examination of Bailey:

> [STATE]:      And was this the, the day that he stayed half a day,
>                was this the day that was about three (3) weeks prior
>                to the 11th, was that what you said?
>
> [BAILEY]:     Yeah.
>
> [STATE]:      Okay. So we have the time that you told us about
>                that is about four (4) weeks prior to the murder and
>                now—
>
> [MARTZ]:      Objection Your Honor. Object to the
>                characterization that this is a murder.
>
> [STATE]:      Well it wasn't a suicide.
>
> [MARTZ]:      There is a decedent and he died. The
>                characterization of a murder is prejudicial.
>
> [COURT]:      [State], what is your response?

---

[2] In addition, Martz has, once again, failed to comply with Appellate Rule 46(A)(8)(b).

[STATE]:     It wasn't a suicide.  The defense knows that.  This was in fact murder.  Mark Gilland was killed.  And I am trying to establish a time period prior to, with this witness.

[COURT]:     At this time, the [c]ourt overrules the objection.  Go on.

[MARTZ]:     Your Honor, would the [c]ourt recognize my ongoing objection?

[COURT]:     The [c]ourt notes that as a continuing objection of the defense.

(Tr. p. 36).  According to Martz, the foregoing conversation amounts to misconduct because

> the [State] and [trial court] established murder in the minds of the jury before the first witness was finished testifying or before evidence of a killing was entered.  Because of those comments and the [trial court's] ruling[,] [Martz] was denied a fair trial because the jury had heard the [State] tell them that a murder had occurred and the [trial court] confirmed it by overruling the objection.

(Appellant's Br. pp. 13-14).

[27]     We find no basis for concluding that the State's reference to the "murder" of Gilland constitutes misconduct.  (Tr. p. 36).  During the preliminary instructions, the trial court informed the jury that Martz had been charged with one Count of murder, a felony, for "knowingly kill[ing] another human being,

to-wit: Mark Gilland." (Tr. p. 7). Moreover, there was no dispute during the trial that Gilland was, in fact, murdered. Dr. Mellen testified that the manner of Gilland's death was a *homicide*, which was caused by the infliction of "multiple gunshot wounds." (Tr. p. 301). Thus, at trial, the only contested matter for the State to prove was *who* murdered Gilland. The State's reference to Gilland's death as a murder was in the context of establishing a timeframe for the witness' conversation with Martz. That is, the State did not refer to Martz as a murderer or otherwise express any personal opinions about Martz' guilt or make any inflammatory comments regarding Martz' character. *See Ellison v. State*, 717 N.E.2d 211, 213-15 (Ind. Ct. App. 1999) (finding the State's reference to the defendant as a "murderer" fell "into the 'gray area' between fair comment and personal expressions of belief" but holding that such conduct did not amount to fundamental error). Accordingly, we conclude that Martz has failed to meet his burden to prove that the State engaged in misconduct.[3]

## CONCLUSION

Based on the foregoing, we conclude that Martz has failed to establish that his trial counsel rendered ineffective assistance. We further conclude that the State did not commit prosecutorial misconduct.

Affirmed.

---

[3] Because we find that Martz has not established that the State's comments amounted to misconduct, we do not reach the issue of fundamental error.

[30] Kirsch, J. and Pyle, J. concur