# IN THE SUPREME COURT OF IOWA

No. 13–0888

Filed November 21, 2014

**IN THE INTEREST OF D.S.,**
     Minor Child.

**D.S.,** Minor Child,
     Appellant,

**STATE OF IOWA,**
     Appellee.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Allamakee County, Alan D. Allbee, Associate Juvenile Judge.

The State seeks further review of a court of appeals decision reversing a juvenile court order adjudicating a child delinquent based on a finding that she committed harassment, in violation of Iowa Code section 708.7(1)(*b*). **DECISION OF COURT OF APPEALS VACATED; JUVENILE COURT JUDGMENT REVERSED AND CASE REMANDED.**

Thais A. Folta, Elwood, O'Donohoe, Braun & White, L.L.P., Cresco and John Slavik, Elwood, O'Donohoe, Braun & White, L.L.P., Charles City, for appellant.

Thomas J. Miller, Attorney General, Bruce L. Kempkes, Assistant Attorney General, and Jill M. Kistler, County Attorney, for appellee.

**ZAGER, Justice**.

A juvenile accused of harassing a peer during an after-school confrontation appeals from her delinquency adjudication.  She contends that there was insufficient evidence to support the finding that she committed harassment under Iowa Code section 708.7(1)(*b*).  She also contends that her delinquency adjudication violated her First Amendment rights under the United States Constitution.  Upon our de novo review, we conclude there was insufficient evidence to support the finding that the juvenile committed harassment.  Because we reach this conclusion on different grounds than did the court of appeals, we vacate the decision of the court of appeals and reverse the judgment of the juvenile court.

## I.  Background Facts and Proceedings.

On February 20, 2013, K.B. approached New Albin Police Chief, Kent Orr, and told him that her fifteen-year-old daughter, T.B., had been harassed at school by a fellow classmate, fifteen-year-old D.S.

Based on this report, Chief Orr went to the home of D.S., who lived with her mother in New Albin.  According to Chief Orr, D.S. answered the door and immediately said, "Let me guess.  This is about [T.B.]"  Chief Orr told D.S. he had received a complaint that she had been harassing T.B.  D.S. replied, "I hate that f*cking b*tch."  Orr then asked D.S. if she talked to T.B. at school.  D.S. answered, "I don't ever talk to that nasty b*tch because she stinks and she f*cked the bus driver.  I don't like her and can't stand being around her."  Before leaving the house, Chief Orr instructed D.S. not to have any contact with T.B.

Chief Orr then met with T.B. and her mother at the police station.  At Chief Orr's request, T.B. wrote a statement of the incident in question.  T.B. wrote:

> I was walking home from the bus and [D.S.] yelled "T-bitch"
> so I turned around and I thought she was talking to me so [I]
> told her "What?" and then she said "I wasn't talking to you
> you fat skanky b*tch! I'm way better than you [and] prettier
> than you and I'm not desperate like you to sleep with the
> bus driver." I replied, "I don't care about looks at least I
> have a heart." [D.S. responded,] "Whatever you skanky
> b*tch!" [D.S.] bullied me about every day since kindergarten.

K.B. added, "Earlier last year we had our house for sale because the harassment is so bad we don't know what else to do."

Later that day, Chief Orr spoke with the mother of D.S. Chief Orr asked her whether she was aware of "what was going on." She answered, "Yes, [T.B.] has issues. She has no friends and is just a spoiled little brat." Chief Orr informed her he had directed D.S. not to have contact with T.B. and asked for her assistance in preventing future harassment. She replied, "Yeah, well . . . I'll do my best."

On March 11, the State filed a "Petition Alleging Delinquency" alleging D.S. had committed a delinquent act as defined in Iowa Code section 232.2(12), specifically harassment in the third degree in violation of Iowa Code sections 708.7(1)(*b*) and 708.7(4). According to the petition, D.S. "did purposefully and without legitimate purpose, have personal contact with another person, with the intent to threaten, intimidate, or alarm that other person."

An adjudicatory hearing was held in juvenile court on May 9. The court heard testimony from Chief Orr, K.B., T.B., D.S., and one of T.B.'s neighbors who witnessed part of the encounter. T.B. testified that on February 20,

> [D.S.] yelled b*tch, and I turned around and asked her if she
> needed to say anything to my face, and she said, "Yeah, well,
> you're a fat skank, and I can get with any guy I want, and
> you can go die in a hole." And I [said], "Well, I don't care
> how I look or I don't care about my weight, but at least I'll
> get farther in life than you'll get." Then she said, "Whatever,
> skank," and walked off.

T.B. further testified that she went home and cried after the incident.

According to T.B., D.S. has bullied her in the past. T.B. testified that the two "used to get kind of along when [T.B.'s] mom was a Girl Scout leader, but after that [D.S.] bullied [her] . . . nonstop . . . ." T.B. further testified that she "couldn't even walk home at night without being scared," and that she is intimidated by D.S.

On cross-examination, T.B. conceded "[D.S.] threatened [her] in the past, not at this event, but . . . before," and that D.S. made her feel intimidated by "in the past . . . picking fights with [her]." She further testified that D.S. made her "feel insecure," as though "[she] . . . almost want[ed] to commit suicide." T.B. testified that she and D.S. were about ten feet apart during the incident. T.B. acknowledged she did not mention in her written statement to Chief Orr that D.S. yelled "you can go die in a hole," but that "it did occur."

On redirect, T.B. testified that during the encounter with D.S. she felt intimidated and thought D.S. was threatening to harm her. T.B. testified that her feelings were based on D.S. "saying mean things to [her], and with all the things she said in the past, just reoccurring."

D.S.'s counsel then cross-examined T.B. again. T.B. was asked what D.S. threatened to do to her. T.B. testified, "She says the exact same things over and over again, and just—I don't know." T.B. then testified that D.S. had "threatened to kill [her] family before." Counsel asked, "Did that happen on February 20?" T.B. answered, "No."

T.B.'s neighbor testified that she heard D.S. yell at T.B. on February 20. She stated that she was unsure whether D.S. "said the C word, c*nt, or s*ut" because she "was shocked." The neighbor testified that she asked T.B., "[D]id she just say what I thought she said?" T.B. responded, "Yes, she did . . . but I'm getting used to it."

D.S. testified that before the incident on February 20, she had gotten off the bus, as she does every day, and lost track of her friend, T.F. In an effort to reunite with T.F., D.S. yelled "T bitch" because "that's what [she] always called her." D.S. testified, T.B. "looked at me and said, 'Thank you,' all snotty." D.S. responded to T.B., "I wasn't talking to you. You're stupid." According to D.S., T.B. "just started yelling a bunch more stuff at [her], and [they] just kept yelling stuff at each other." The incident lasted about five minutes. D.S. testified she was not trying to intimidate or alarm T.B., and that she did not make any threats to T.B.

The juvenile court issued its "Findings, Conclusions, and Order" on May 10. In its order, the court highlighted inconsistencies between T.B.'s testimony and her statement to police. Specifically, it noted that T.B. did not mention in her statement to Chief Orr that D.S. told her "she could die in a hole," which T.B. testified to at the hearing. It further noted that T.B.'s statement to Chief Orr alleged D.S. made comments concerning T.B. "having sexual relations with the bus driver." However, T.B. had failed to mention that in her testimony. Based on these inconsistencies, the juvenile court concluded that T.B.'s testimony with respect to these statements was not credible.

The juvenile court also found it was not reasonable to believe T.B. anticipated any physical harm or threat of physical harm from D.S. because D.S. is substantially shorter and weighs less than T.B. In addition, the court noted T.B. testified she was not threatened during the incident and that T.B. was not in apprehension of imminent physical harm during this encounter. Nevertheless, the court found D.S.'s statements were meant as a put down, had no legitimate purpose, and that D.S. intended her statements to make T.B. lack self-confidence in her relations with the opposite sex and about her body-build.

The juvenile court then consulted dictionary definitions of the statutory terms "threaten," "intimidate," and "alarm." Specifically, it interpreted the term "intimidate" to mean "to make timid or fearful," and in turn defined "timid" as "lacking in courage or self-confidence." Thus, the juvenile court ultimately concluded the term "intimidate" means to "make one lack courage or self-confidence." The court then concluded the State had proven beyond a reasonable doubt that D.S. committed harassment in the third degree by means of intimidation. The juvenile court rejected the First Amendment defense raised by D.S. in a prior motion. Accordingly, the court adjudicated D.S. to have committed a delinquent act.

D.S. appealed, and the case was transferred to the court of appeals. The court of appeals determined the district court erred in defining "intimidate" as "lacking in courage or self-confidence." Instead, based on dictionary definitions, and applying our rules of statutory construction, the court of appeals held "intimidate" means to "inspire or affect with fear" or to "frighten." Applying this narrower definition, the court of appeals concluded the State had failed to prove D.S. harassed T.B. under section 708.7(1)(*b*) and reversed the delinquency adjudication.

The State applied for further review, which we granted.

## II. Standard of Review.

Delinquency proceedings are "special proceedings that serve as an alternative" to criminal prosecution of a child. *In re J.A.L.,* 694 N.W.2d 748, 751 (Iowa 2005). The objective of the proceedings is the best interests of the child. *Id.* We review the sufficiency of the evidence for juvenile adjudications de novo. *See In re A.K.,* 825 N.W.2d 46, 49 (Iowa 2013). While in reviewing such proceedings we give weight to the factual findings of the juvenile court—especially regarding witness credibility—

we are not bound by them. *Id.* "We presume the child is innocent of the charges, and the State has the burden of proving beyond a reasonable doubt that the juvenile committed the delinquent acts." *Id.* (citing Iowa Code § 232.47(10) (2011)).

When a constitutional challenge is made to a statute, our review is de novo. *In re N.N.E.,* 752 N.W.2d 1, 6 (Iowa 2008). Additionally, our review of an interpretation of a statute is for correction of errors at law. *Id.*

### III. Sufficiency of the Evidence.

Our threshold determination is whether there is sufficient evidence in the record to support the adjudication. As stated earlier, we review sufficiency-of-the-evidence claims in the juvenile context de novo. *In re A.K.,* 825 N.W.2d at 49. Thus, we must first determine whether the State has proven beyond a reasonable doubt that D.S. violated the harassment statute. *See id.*

In order to address whether there is sufficient evidence to support the adjudication, we must first review Iowa Code section 708.7(1)(*b*), which provides:

> A person commits harassment when the person, purposefully and without legitimate purpose, has personal contact with another person, with the intent to threaten, intimidate, or alarm that other person. As used in this section, unless the context otherwise requires, "*personal contact*" means an encounter in which two or more people are in visual or physical proximity to each other. "*Personal contact*" does not require a physical touching or oral communication, although it may include these types of contacts.

Iowa Code § 708.7(1)(*b*) (2013).

Next, we must look at the specific elements of the crime contained within the statute. The first element of the statute requires that a person purposefully *and* without legitimate purpose has personal contact with

another person. *Id.* We have previously defined the term "purposeful" within section 708.7(1)(*b*) as "[h]aving a purpose; intentional." *State v. Button*, 622 N.W.2d 480, 484 (Iowa 2001) (quoting American Heritage Dictionary 1006 (2d ed. 1985)). While the term "purposefully" has been construed as a general-intent element in the context of our stalking statute, "the determination of whether a statute requires general or specific intent turns on the language of the act, read in the light of its manifest purpose and design." *State v. Neuzil*, 589 N.W.2d 708, 711 (Iowa 1999) (classifying stalking as a general-intent crime and holding the purposeful requirement does not require proof of defendant's subjective desires). General-intent crimes focus "not on the defendant's mental state but on the result defendant's purposeful acts cause in a reasonable person." *Id.*

In contrast, specific-intent crimes refer to the "defendant's intent to do some *further* act or achieve some *additional consequence*." *State v. Buchanan*, 549 N.W.2d 291, 294 (Iowa 1996) (quoting *Eggman v. Scurr*, 311 N.W.2d 77, 79 (Iowa 1981)). Specific-intent crimes designate "a special mental element which is required above and beyond any mental state required with respect to the actus reus of the crime." *Neuzil*, 589 N.W.2d at 711 (quoting *Buchanan*, 549 N.W.2d at 294). We have previously determined that "harassment is a specific intent crime." *State v. Evans* (*Evans II*), 671 N.W.2d 720, 724 (Iowa 2003). Thus, the harassment statute requires that at the time the defendant purposefully has personal contact[1] with another, he or she also has the "specific intent to threaten, intimidate, or alarm" them. *See State v. Evans* (*Evans*

---

[1]It is undisputed that D.S. and T.B. had personal contact with one another on February 20. Both testified they engaged in oral communication with the other while in close, visual proximity to one another.

*I*), 672 N.W.2d 328, 331 (Iowa 2003); *cf. State v. Lambert,* 612 N.W.2d 810, 813 (Iowa 2000) (recognizing there must be a concurrence of the actus reus and the mens rea).

To determine whether there is sufficient evidence to support the adjudication, we rely on our definitions of the terms purposeful and personal contact, as well as our classification of harassment as a specific-intent crime. Therefore, the State needed to establish beyond a reasonable doubt that D.S. purposefully had personal contact with T.B. with the specific intent to do some further act or achieve some additional consequence: threaten, intimidate, or alarm her. Upon our de novo review of the record, we find the State failed to prove beyond a reasonable doubt that D.S. purposefully or intentionally put herself in personal contact with T.B. with the specific intent to threaten, intimidate or alarm T.B. Consequently, the juvenile court committed error in finding the State had proven D.S. committed the crime of harassment and in adjudicating D.S. delinquent.

We have previously found purposeful personal contact where a defendant intentionally placed himself in contact with the victim, or where a defendant purposefully engaged in conduct leading to personal contact with the victim. *See, e.g., Evans I,* 672 N.W.2d at 330–31 (finding purposeful personal contact where defendant approached woman in store parking lot to examine her shoes); *Evans II,* 671 N.W.2d at 722–25 (finding purposeful personal contact where defendant went to the victim's house uninvited on three separate occasions after the victim had repeatedly rebuffed defendant's contact); *State v. Reynolds,* 670 N.W.2d 405, 410 (Iowa 2003) (finding purposeful personal contact where defendant followed victim in his SUV); *Button,* 622 N.W.2d at 484–85 (finding purposeful personal contact where, after being given repeated

opportunities to terminate an encounter with a police officer, defendant chose to act uncooperatively and belligerently, prolonging his detention wherein he ultimately made threatening statements to the officer).

In *Button* we held the defendant made purposeful personal contact with a police officer, despite the fact that the charged incident occurred while the defendant was detained by law enforcement against his will. 622 N.W.2d at 484–85. The charges in *Button* arose from threatening statements made by the defendant after he was detained at a casino for being in a drunken state. *Id.* at 482. After police officers arrived at the scene, the defendant became "uncooperative to such an extent that he was placed under arrest." *Id.* While in custody, the defendant made two threatening statements to the arresting officer, for which a jury found him guilty of harassment. *Id.*

The defendant appealed, asserting that one "cannot commit purposeful contact when he is being held against his will." *Id.* at 483. We rejected that argument, holding the defendant committed "purposeful acts when: (1) He chose to make the threats, turning the communication into harassment, and (2) He chose to be uncooperative leading to his detention and placing him in a position to make the threats." *Id.* at 485. Specifically, we noted:

> Button had the choice to either answer [the officer's] questions and be allowed to leave or continue to be argumentative and be forced to stay in [his] company. His fate was in his own hands. Button purposefully chose to be abusive and uncooperative, which ultimately led to his arrest and the detention where he made his threatening statements.

*Id.* at 484.

In *Evans I,* we found purposeful personal contact where the defendant approached the victim in a store parking lot and asked to

examine her shoes. 672 N.W.2d at 330–31. After the victim removed one of her shoes, the defendant attempted to take hold of her foot. *Id.* at 330. The victim pulled her foot away and quickly entered her vehicle and left the parking area. *Id.* The defendant later pulled up next to her car and smiled and waved. *Id.* Similarly, in *Evans II*, we found purposeful personal contact where the defendant repeatedly and intentionally initiated personal contact with the victim. 671 N.W.2d at 724–25. Defendant's conduct in that case included: making repeated phone calls to the victim's residence; approaching the victim at a drug store and a car wash; and on three separate occasions, appearing unannounced and uninvited at the victim's residence. *Id.* at 722–23.

Any purposeful personal contact involving D.S. in this case is clearly distinguishable from the defendants in *Evans I* and *II* and in *Button.* In those cases, the defendants intentionally placed themselves in contact with the victims, or purposefully engaged in conduct leading to personal contact with the victims. D.S., on the other hand, did not purposefully or intentionally initiate the personal contact with T.B., or purposefully engage in conduct that led to the personal contact. Rather, the record shows that both D.S. and T.B. exited the school bus after school as they had apparently done on every prior occasion without incident. The record shows that D.S. yelled "T bitch" to one of her other friends, which only incidentally spurred the encounter with T.B. The record revealed that the comment was not directed to T.B., and no evidence was presented that D.S. had any intention of initiating personal contact with T.B. D.S. testified that when she exited the bus and first yelled "T bitch," she was not yelling at T.B. but rather her friend, T.F. The initial written statement provided by T.B. to Chief Orr noted that D.S. yelled, generally, "T bitch," making no specific reference to T.B.

herself. The statement to Chief Orr further provided that after T.B. responded to D.S., D.S. replied, "I wasn't talking to you . . . !" Thus, T.B.'s account to Chief Orr corroborates D.S.'s version of events, namely that D.S. "wasn't talking to [T.B.]," and therefore did not act purposefully or intentionally in creating the encounter. There is insufficient evidence in the record to support this element of harassment.

Moreover, as noted above, the harassment statute requires that *at the time* the defendant purposefully has personal contact with another, he or she also has the specific intent to threaten, intimidate, or alarm that person. Put another way, in order to sustain a conviction for harassment under section 708.7(1)(*b*), the State must prove beyond a reasonable doubt D.S. had formed the intent to threaten, intimidate, or alarm T.B. when she purposefully sought out the encounter. Accordingly, had the State established that D.S. purposefully or intentionally had personal contact with T.B., there is still no evidence in the record demonstrating that at the time D.S. initiated the contact with T.B. she possessed the requisite specific intent to threaten, intimidate, or alarm T.B.

Because we have concluded that D.S. did not act purposefully or intentionally in creating the encounter with T.B., or that she possessed the requisite specific intent to threaten, intimidate, or alarm T.B. at the relevant time, we need not reach the issue addressed by the court of appeals regarding the proper definition of the word "intimidate" under section 708.7(1)(*b*). Further, because our decision on the sufficiency-of-the-evidence argument provides D.S. the redress she seeks, we need not reach the constitutional issue raised in this case. *See Hawkeye Land Co. v. Iowa Utils. Bd.*, 847 N.W.2d 199, 210 (Iowa 2014) ("If [a] case may be resolved on statutory grounds, we need not reach [the] constitutional

argument."); *State v. Seering*, 701 N.W.2d 655, 663 (Iowa 2005) (recognizing our "duty to avoid constitutional questions not necessary to the resolution of an appeal"); *Button*, 622 N.W.2d at 485 ("Ordinarily we will not pass upon constitutional arguments if there are other grounds on which to resolve the case."); *State v. Fratzke*, 446 N.W.2d 781, 783 (Iowa 1989) ("We note at the outset that we need not reach the constitutional questions because [the defendant's] sufficiency of the evidence argument . . . gives him the redress he seeks.").

## IV. Conclusion.

There is insufficient evidence in the record to support the adjudication of D.S. as delinquent under our harassment statute. The State failed to prove that D.S. purposefully or intentionally made personal contact with T.B. with the specific intent to threaten, intimidate, or alarm T.B. While we clearly do not condone the behavior demonstrated by D.S. in this case, the juvenile court committed error when it adjudicated D.S. delinquent under the harassment statute. We vacate the decision of the court of appeals, reverse the judgment of the juvenile court, and remand the case to the juvenile court for an order dismissing the petition.

**DECISION OF COURT OF APPEALS VACATED; JUVENILE COURT JUDGMENT REVERSED AND CASE REMANDED.**