# IN THE COURT OF APPEALS OF IOWA

No. 17-0063
Filed April 18, 2018

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**BLAKE FREDERICK KING,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Bremer County, Christopher C. Foy, Judge.

        Defendant challenges his convictions for two counts of burglary in the first degree and one count of sexual abuse in the third degree. **SEXUAL ABUSE CONVICTION AFFIRMED, BURGLARY CONVICTIONS VACATED, AND REMANDED FOR RESENTENCING.**

        Alfredo Parrish, Andrew J. Dunn, and Gina Messamer of Parrish Kruidenier Dunn Boles Gribble Gentry Brown & Bergmann L.L.P., Des Moines, for appellant.

        Thomas J. Miller, Attorney General, and Linda J. Hines, Assistant Attorney General, for appellee.

        Heard by Danilson, C.J., and Vaitheswaran, Doyle, Tabor and McDonald, JJ.

**MCDONALD, Judge.**

Précis: twenty-first birthday; party bus; young people; alcohol; sex act; she said; he said; accused; charged; tried; convicted. In this direct appeal, the defendant Blake King now challenges his convictions for two counts of burglary in the first degree, in violation of Iowa Code sections 713.1 and 713.3 (2016), and sexual abuse in the third degree, in violation of Iowa Code sections 709.1 and 709.4(1)(d). King raises several claims on appeal. King argues he was denied a fair trial when the district court denied King's motions to strike certain jurors. King challenges the sufficiency of the evidence supporting the convictions. King also contends his counsel provided constitutionally deficient representation in failing to raise an intoxication defense and request an intoxication instruction.

I.

The offense conduct at issue occurred on the night M.A. celebrated her twenty-first birthday. She rented a party bus and invited some friends, including King, to join her for a night of revelry. The friends met and boarded the bus in Shell Rock around 7 p.m. Over the course of the evening, the bus traveled to drinking establishments in Shell Rock, Waverly, Janesville, and Cedar Falls. Different people joined and left the party at different locations. M.A. testified there were approximately fifteen to twenty people on the party bus at any particular point in time. The partygoers had fun on the bus; they drank and "grinded" on each other. At the end of the night, some of the partygoers, including M.A. and King, went to a friend's house and continued to celebrate until approximately three o'clock in the morning.

At the end of the night, King drove M.A. home.  Also in the car were Ariel Pratt, King's younger brother, and the younger brother's two friends.  Pratt was one of M.A.'s closest friends and part of M.A.'s "friend group," which also included King.  Pratt and King shared a mutual attraction and were in the beginning stages of a romantic relationship.  The "friend group" spent nearly every weekend together, including frequently drinking together.  M.A. had stayed the night at King's house on prior occasions.  She had also slept in King's bed before, after a night of drinking.

When the group arrived at M.A.'s house, King accompanied M.A. into the house while Pratt waited in the car.  After waiting outside for several minutes, Pratt received a text message from King regarding M.A.'s cat.  Pratt went inside to follow up.  M.A. testified she conversed briefly with Pratt and King.  M.A. requested Pratt and King help M.A. find her cat, which slept in M.A.'s bed with her, and get M.A. a glass of water.  Pratt and King found the cat, got M.A. a glass of water, and left the house.  M.A. testified she closed her bedroom door, undressed herself, changed into her pajamas, and went to sleep.

M.A. testified the next thing she remembered was waking up and "feeling very uncomfortable."  She noticed her pants and underwear were not on.  She pulled a condom out of her vagina.  She saw the silhouette of a person.  She held out the condom and said, "What is this.  What are you doing.  What just happened."  The person responded, "Nobody has to know."  M.A. recognized the voice as King's.  She told King to get out, and he did.  At the time, M.A. was residing in the spare bedroom of her friends Courtney Carolus and Nick West.  After King left, M.A. immediately went into Carolus and West's bedroom and woke up Carolus.

M.A. said, "Blake was just here.  Like he just had sex with me.  I didn't have sex with him."  She specifically testified she was clear headed at the time.  Carolus told M.A. she had a bad dream and should go back to bed.  M.A. did so.

The next day M.A. messaged King and asked him what happened the night before.  She messaged she "woke up to all of a sudden crying and pulling a condom out of me . . .  I never willingly have se[x] with random people.  I've only ever had sex with the people I've dated and been in a relationship with so I literally got raped."  King replied, "We never had sex!"  King messaged back that M.A. pulled him down toward her, she "grinded" on him, and so he put on a condom.  King messaged that he could not get an erection, the condom came off, and M.A. told him "nevermind" and he should just leave.  He emphatically messaged again, "We never had sex."  They ended this electronic conversation by promising to not tell anyone about the prior night's events.  After this initial exchange M.A. went about her day, spoke with Pratt and Carolus, and tended her social media account.  At some point during the day, M.A. posted on her social media account a picture of herself with King and others and the caption, "best birthday ever."  Later that evening, M.A.'s attitude changed, and she sent King a message, "I've done some thinking and honestly what you did was wrong and f*cked up.  I was asleep when you basically raped me. . . . I don't remember ever pulling you down and apparently grinding on you but that is no invite to come back to someone's house that isn't yours to try and have sex with me."  King responded, among other things, "We didn't have sex! . . . You initiated it, but it never even went anywhere."  The parties exchanged several more messages and ceased communications.

M.A. reported the incident to police, and King was criminally charged. King testified at trial. King testified when he dropped M.A. off at her house, he went to say good night to her and M.A. "grabbed [him] by [his] shirt and kissed [him]. And she told [him] that she didn't want to be alone for the night." King testified this took a few minutes so he sent Pratt a text message regarding the cat, apparently as a cover for the delay. King told M.A. he would come back after he dropped off Pratt. After King sent the text message to Pratt, she came into the house. King and Pratt then found M.A.'s cat, got M.A. a glass of water, and had a brief conversation with M.A. before they left. King dropped off Pratt, his brother, and his brother's friends and then returned to the house. He testified he entered the house and entered M.A.'s bedroom. He remembered the door was closed, but he was able to nudge the door open without turning the doorknob. He said to M.A., "Hey, [M.A.] do you still want me to stay," and she replied, "Yes, come here." According to King, M.A. shifted in the bed and lifted the blanket for him. He got into the bed and under the blanket. He was wearing only his boxer shorts and a shirt. The two began "spooning." King testified M.A. was "grinding" on him. She eventually reached back and grabbed his erect penis and manually stimulated him. He ejaculated after "a couple minutes." King testified he stood up to remove his wet boxer shorts, and M.A. told him "she wasn't on birth control and if [they] were going to have sex, [he] would have to use a condom." She initially directed him to her nightstand for a condom, although from there he testified he could not remember all the details about how a condom was located. He put on the condom but was unable to maintain an erection. The two spoke for a bit, including agreeing not to tell Pratt, before M.A. told King he should go. King left. He maintained at trial that he did

not have sexual intercourse with M.A. and that the sex act that did occur was consensual.

There was forensic evidence presented at trial. A semen sample was collected from the string of M.A.'s tampon. M.A. testified she found the tampon lying on the floor under her bed the day after the events at issue. M.A. testified she did not remember removing the tampon and King must have removed it while she was sleeping. In contrast, King testified M.A. removed the tampon in his presence, which he found unpleasant, which was one of the reasons he could not maintain an erection. The seminal fluid found on the string of the tampon matched King's DNA. King's DNA was also found on the fitted sheet. There was no DNA evidence in M.A.'s underwear, mouth, vagina, or anus.

After hearing the evidence, the jury found King guilty of two counts of burglary in the first degree and sexual abuse in the third degree. The district court merged the convictions and sentences for sex abuse in the third degree and one count of burglary in the first degree into the other count of burglary in the first degree. The district court sentenced King to an indeterminate term of incarceration not to exceed twenty five years, and King timely filed this appeal.

## II.

We first address King's claims of error related to the district court's denial of King's request to strike for cause two jurors. We review the district court's rulings on challenges to potential jurors for cause for abuse of discretion. *State v. Jonas*, 904 N.W.2d 566, 570–71 (Iowa 2017).

"The Iowa Rules of Criminal Procedure provide a list of factual circumstances which constitute a basis for which the trial court may sustain a

challenge for cause." *State v. Hatter*, 381 N.W.2d 370, 372 (Iowa Ct. App. 1985). "Three principles govern our review of such questions." *State v. Williams*, 285 N.W.2d 248, 267 (Iowa 1979). First, the trial court has broad discretion. *Id.* Second, "a determination of a prospective juror's qualifications must rest upon the entire record of the examination." *Id.* Third, the trial judge is the fact-finder when determining whether a ground for challenge exists. *Id.* "While we have generally reviewed disqualification of jurors deferentially, we have long cautioned trial courts against allowing close issues to creep into the record and threaten the validity of a criminal trial." *Jonas*, 904 N.W.2d at 575.

### A.

King claims the district court erred in denying his motion to strike for cause juror J.B. During voir dire, the juror disclosed that her daughter had been sexually assaulted by an acquaintance, specifically a twenty-two or twenty-three year old man, three months prior to this trial and that the incident was under investigation. The juror explained to the court she could nonetheless remain fair and impartial in evaluating the evidence in this case. The district court denied King's motion to strike the juror for cause. King exercised a peremptory strike to remove the juror, but King did not request an additional peremptory strike as a remedy.

This claim does not entitle King to any relief because he cannot establish prejudice. In the recent *Jonas* case, the supreme court reaffirmed a criminal defendant is not entitled to relief "where a judge improperly denies a challenge for cause but the defendant does not specifically ask for an additional peremptory challenge of a particular juror after exhausting his peremptory challenges under the rule." *Jonas*, 904 N.W.2d at 583. The defendant's briefing was submitted prior

to the *Jonas* decision, but counsel conceded during oral argument *Jonas* forecloses any claim to relief this court could provide.

B.

King also contends the district court abused its discretion in refusing to grant his motion to strike for cause juror P.J. Relatedly, King contends the district court abused its discretion in denying his motion for new trial based on the ground juror P.J. should have been struck from the jury. We review the district court's ruling on the challenge to the juror for an abuse of discretion. *See Jonas*, 904 N.W.2d at 570–71. Our review of "a denial of a motion for a new trial based upon juror misconduct or juror bias is for an abuse of discretion." *State v. Webster*, 865 N.W.2d 223, 231 (Iowa 2015).

The issue related to Juror P.J. arose mid-trial. During the presentation of the defendant's case, the juror indicated to the court attendant he knew M.A.'s family. After the defense rested but before the case was submitted to the jury, the district court allowed the attorneys to conduct additional voir dire of juror P.J. outside the presence of the jury. The juror stated seeing M.A.'s mother in the courtroom jarred his memory. He stated he was once good friends with M.A.'s father, his wife had been friends with M.A.'s mother, and he knew M.A. when she was a little girl. He stated he and his wife no longer maintained any relationship with M.A. or M.A.'s family. He stated, "We don't talk on the phone. We don't go out. We just—It's just if we see each other on the street, we might say hi or say how you doing. That's about it." It was apparent from the juror's statements he had not had any personal contact with the family since the time the victim was a little girl, perhaps fifteen years ago based on M.A.'s present age. At minimum, it

had been so long since the juror had any interaction with the victim or the family that he did not recognize M.A. during the course of trial. Juror P.J. assured the court he could be impartial. At that time, King moved to strike for cause, which the district court denied.

"For the purpose of determining juror prejudice, the relevant question is not what a juror has been exposed to, but whether the juror holds such a fixed opinion of the merits of the case that he or she cannot judge impartially the guilty or innocence of the defendant." *State v. Gavin*, 360 N.W.2d 817, 819 (Iowa 1985). "The mere fact a juror has knowledge of parties or witnesses does not indicate actual bias or require juror disqualification." *Webster*, 865 N.W.2d at 238–39 (finding no abuse of discretion requiring new trial when juror knew victim's family "well enough to say 'Hi' to them"); *State v. Virden*, No. 15-1276, 2016 WL 5484953, at *6 (Iowa Ct. App. Sept. 28, 2016) (finding jurors past business relationship with witness provided "no evidence the juror was biased"). The district court is in the best position to judge the credibility of the juror. *See Webster*, 865 N.W.2d at 238; *State v. Smith*, No. 16-0126, 2017 WL 2875390, at *4 (Iowa Ct. App. July 6, 2017) (finding no abuse of discretion because "[t]he district court is given broad discretion in fact-finding, and it found the jury foreperson's testimony believable when he said he was able to keep his knowledge of the sex offender registry separate from the trial").

We conclude the district court did not abuse its discretion in denying the motion to strike the juror or in denying the motion for new trial. Here, the district court found the juror credible when he testified he had a former relationship with the victim's family, had no present relationship with the family, did not even

recognize the victim during the course of trial, and could be fair and impartial.    A

similar fact pattern was presented in the *Webster* case, in which a juror revealed

during trial that she knew the victim's family.  The supreme court determined the

district court did not abuse its discretion in denying the defendant's motion to strike

the juror and in denying the defendant's motion for new trial:

> In short, we are not faced with a juror who lied during voir dire or
> during an in camera hearing in order to avoid the risk of being
> disqualified.   Thus, an important feature present in many actual
> disqualification cases is lacking here.   Further . . . the juror
> emphatically emphasized that she was capable of, and did in fact,
> base her verdict solely on the evidence.

865 N.W.2d at 238.  As in *Webster*, King did not establish this juror misled the

parties and the district court during voir dire, did not establish this juror was

prejudice or biased, and did not establish the challenged juror could not be fair and

impartial.  In the absence of any such proof, the district court did not abuse its

considerable discretion in denying the motion to strike and motion for new trial.

Finally, King also argues his constitutional and statutory rights were violated

when the juror failed to disclose the prior relationship during vior dire and thereby

denied King the right to peremptorily strike the juror.  King fails to develop this

claim.  We will not construct the argument for counsel.  *See In re Detention of

West*, No. 11-1545, 2013 WL 988815, at *3 (Iowa Ct. App. Mar. 13, 2013) (citing

*United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.1991)) ("A skeletal argument,

really nothing more than an assertion, does not preserve a claim. . . . Judges are

not like pigs, hunting for truffles buried in briefs.").  To the extent King's claim

relates to the denial of his right to meaningfully exercise a peremptory challenge

due to the failure to disclose information, the claim fails because the district court

found, and we agree, the juror did not lie during voir dire to avoid being disqualified from service and there was no grounds to remove this juror for cause.

C.

In sum, we hold the district court did not abuse its discretion in denying the defendant's motion to strike for cause the two challenged jurors and the defendant's motion for new trial relating to the same. The district court found both of the jurors could be fair and impartial and render a verdict based solely on the evidence. We give deference to the district court's credibility determination. Further, to the extent the district court should have removed juror J.B., the defendant cannot establish prejudice for the reasons set forth in *Jonas*.

III.

King challenges the sufficiency of the evidence supporting his convictions. We will uphold a verdict if substantial record evidence supports it. *State v. Webb*, 648 N.W.2d 72, 75 (Iowa 2002). "Evidence is substantial if it would convince a rational fact finder that the defendant is guilty beyond a reasonable doubt." *Id.* at 75–76. When reviewing for the sufficiency of the evidence, we view the evidence in the light most favorable to the State but consider all evidence in the record. *Id.* at 76. "The State must prove every fact necessary to constitute the crime with which the defendant is charged. The evidence must raise a fair inference of guilt and do more than create speculation, suspicion, or conjecture." *Id.* (internal citations omitted).

To the extent King's trial counsel failed to preserve error with respect to the sufficiency challenges raised in this appeal, King requests we review the challenges as claims of ineffective assistance of counsel. This court conducts de

novo review of claims of ineffective assistance of counsel. *See Everett v. State*, 789 N.W.2d 151, 155 (Iowa 2010). To succeed on an ineffective-assistance claim a defendant must show "(1) counsel failed to perform an essential duty; and (2) prejudice resulted." *State v. Maxwell*, 743 N.W.2d 185, 195 (Iowa 2008). With respect to the first element, "we measure counsel's performance against the standard of a reasonably competent practitioner." *Id.* Poor strategy or mistakes in judgment normally do not rise to the level of ineffective assistance. *See Ledezma v. State*, 626 N.W.2d 134, 143 (Iowa 2001). "The failure of trial counsel to preserve error at trial can support an ineffective assistance of counsel claim." *State v. Truesdell*, 679 N.W.2d 611, 615–16 (Iowa 2004). "A claim of ineffective assistance of trial counsel based on the failure of counsel to raise a claim of insufficient evidence to support a conviction is a matter that normally can be decided on direct appeal." *Id.* at 616. "Clearly, if the record in this case fails to reveal substantial evidence to support the convictions, counsel was ineffective for failing to properly raise the issue and prejudice resulted. On the other hand, if the record reveals substantial evidence, counsel's failure to raise the claim of error could not be prejudicial." *Id.*

## A.

King argues the evidence is insufficient to support his conviction for Count I, burglary in the first degree with the intent to commit sex abuse. *See* Iowa Code § 713.3(1)(d). To resolve the claim, we turn to the instructions given in this case. An instruction given without objection is the law of the case for purposes of our review as to the sufficiency of the evidence. *See State v. Canal*, 773 N.W.2d 528,

530 (Iowa 2009). The marshalling instruction provided the State had to prove the following:

> 1. On or about December 21, 2014, Defendant broke or entered into an occupied structure located at 620 Sixth Avenue N.W., Waverly, Iowa.
> 2. One or more persons were present in the occupied structure.
> 3. Defendant had no right, license, or privilege to break or enter into the occupied structure or exceeded his rights with respect to the time of entering or the place into which he entered.
> 4. Defendant broke or entered into the occupied structure with the specific intent to perform a sex act with [M.A.] while she was mentally incapacitated or physically helpless.
> 5. Defendant did perform a sex act with [M.A.] in the occupied structure while she was mentally incapacitated or physically helpless.

King contends the evidence is insufficient to establish he had no right, license, or privilege to break or enter into the occupied structure or exceeded his rights with respect to the time of entering or the place into which he entered. Specifically, he contends Carolus and West, the legal tenants of the home, gave him permission to enter any part of the home at any time. He contends this would include M.A.'s bedroom.

As a legal matter, it is unclear whether Carolus and West's grant of permission to enter any part of the home would extend to M.A.'s bedroom. "At common law, "[t]he crime [of burglary] was considered to be an offense against the security of habitation or occupancy . . . It was not designed to protect property or ownership, rather the notion that people should be able to feel secure in their homes." *State v. Hagedorn*, 679 N.W.2d 666, 669 (Iowa 2004) (quoting *State v. Pace*, 602 N.W.2d 764, 768 (Iowa 1999)); *State v. Miller*, 622 N.W.2d 782, 787 (Iowa Ct. App. 2000) ("The crime of burglary was not designed to protect property rights, as the theft statutes are. Instead, the crime is considered to be an offense

against the security of habitation or occupancy."). "Burglary laws are based primarily upon a recognition of the dangers to personal safety created by the usual burglary situation—the danger that the intruder will harm the occupants in attempting to perpetrate the intended crime [or] to escape . . . [t]he laws are primarily designed, then, not to deter the trespass and the intended crime, which are prohibited by other laws, so much as to forestall the germination of a situation dangerous to personal safety." *Pace*, 602 N.W.2d at 768. In accord with the common law purpose of the rule, it appears a defendant can be convicted of burglary upon entering a private area within a larger occupied structure even where a defendant had the right, license, or privilege to enter the greater structure. *See, e.g., State v. Lane*, No. 14-1449, 2015 WL 8388361, at *8 (Iowa Ct. App. Dec. 9, 2015) ("Even if [defendant] had a general right of entry to the common areas of the residence, he did not have the right to enter the bedrooms of the tenants, which they uniformly testified were considered private."); *State v. Brassell*, No. 13-1523, 2014 WL 3748319, at *2 (Iowa Ct. App. July 30, 2014) (finding "[resident] testified he told [the defendants] they did not have permission to go upstairs onto the main level because Larrew lived there. Even crediting [defendants'] testimony that [resident] said the men could go upstairs and get drinks, that only granted them the right to enter into the kitchen. The men had no authority to leave the kitchen area and enter Larrew's bedroom").

As a factual matter, King's claim is unavailing. Carolus testified at trial. She testified initially that King was her friend and he generally had permission to be in any room in her home. This would support King's contention he had the right, license, and privilege to enter M.A.'s bedroom. However, upon cross-examination,

Carolus conceded permission would not extend to M.A.'s bedroom if the door was closed. It was not disputed M.A.'s door was closed. M.A. testified she remembered closing her bedroom door prior to going to sleep. King testified the door was closed when he returned to the home and he had to push the door open to enter the bedroom. M.A. testified she had not given King permission to enter her room. When viewed in the light most favorable to the verdict, there is sufficient evidence to establish King entered M.A.'s bedroom without the right, license, or privilege to do so.

King also challenges the sufficiency of the evidence establishing he had the requisite specific intent at the time he entered M.A.'s bedroom. Specific intent refers to the aim of the accused to "do some further act or achieve some additional consequence." *In re D.S.,* 856 N.W.2d 348, 352 (Iowa 2014). Specific-intent crimes designate "a special mental element which is required above and beyond any mental state required with respect to the actus reus of the crime." *Id.* Specific intent is seldom capable of direct proof. *See State v. Kirchner*, 600 N.W.2d 330, 334 (Iowa Ct. App. 1999). The State may establish the intent element by circumstantial evidence and reasonable inferences arising from that evidence. *See State v. Acevedo*, 705 N.W.2d 1, 5 (Iowa 2005). The mere fact that the defendant actually committed a crime after entry is, without more, insufficient to prove his intent to commit a crime at the time of entry. *See Parreira v. Commonwealth*, 971 N.E.2d 242, 248 n.10 (Mass. 2012) ("However, the eventual commission of a crime is not in every case determinative of a defendant's 'specific intent at the time of entry to perpetrate that particular act.'"); *Commonwealth v. Williams*, No. 314 MDA 2013, 2013 WL 11253433, at *3 (Pa. Super. Ct. 2013).

Instead, when the jury is asked to draw an inference from circumstantial evidence regarding the defendant's specific intent to commit an offense, the State must prove a sufficient set of facts, of which the commission of a crime may be one, that make it more likely than not that the ultimate inference to be drawn regarding the defendant's specific intent is in fact true. *See State v. Olson*, 373 N.W.2d 135, 137 (Iowa 1985); *see also Williams v. State*, 983 N.E.2d 661, 668 (Ind. Ct. App. 2013) ("The evidence showing the intent to commit a felony need not be insurmountable, but there must be a specific fact that provides a solid basis to support a reasonable inference that the defendant had the specific intent to commit a felony.").

Here, the State was required to prove King entered M.A.'s room with the "specific intent to perform a sex act with [M.A.] while she was mentally incapacitated or physically helpless." Proof of King's intent or hope to have a sexual encounter with M.A. is insufficient. Instead, the State was required to prove, at the time of entry, King intended to achieve the specific purpose of performing a sex act with M.A. while she was "mentally incapacitated" or "physically helpless." *See, e.g., State v. Fountain*, 786 N.W.2d 260, 265 (Iowa 2010); *Wyatt v. Iowa Dep't. Human Serv.*, 744 N.W.2d 89, 94 (Iowa 2008) ("[T]he State must demonstrate not only that the defendant intended to make physical contact, but that the defendant intended that physical contact to be insulting or offensive."); *State v. Taylor*, 689 N.W.2d 116, 125 (Iowa 2004) ("Thus, the State was required to prove the defendant intended to cause pain and injury to his wife or to have physical contact that would be insulting or offensive to her when he lifted her out of the van."); *State v. Pacheo*, 14-1978, 2016 WL 530706, at *4 (Iowa Ct. App. Feb. 10, 2016) (finding ineffective assistance where counsel failed to object to

instruction that left jurors "with the misimpression that the State satisfied its burden by showing only that Pacheco attempted to enter the apartment with the specific intent to have physical contact with M.H., no matter how innocuous"). In short, the defendant "must have subjectively desired the prohibited result." *State v. Redmon*, 244 N.W.2d 792, 797 (Iowa 1976).

We cannot conclude there is substantial evidence establishing King had the specific intent, at the time of entry into the bedroom, to perform a sex act with M.A. while she was mentally incapacitated or physically helpless. In this case, the State needed to present evidence from which the jury could infer at the time of entry King knew or expected M.A. to be mentally incapacitated or physically helpless and at the time of entry he hoped to achieve the purpose of performing a sex act on her while she was mentally incapacitated or physically helpless. Other than the act itself, there is not evidence of other facts supporting the ultimate inference to be drawn. At the time King left the residence, M.A. did not appear to be mentally incapacitated or physically helpless. Pratt testified M.A. had been drinking water for some of the evening because M.A.'s mother was present at the party. M.A. walked without assistance into her home. Inside the home, M.A. requested her cat and a glass of water. She was able to converse with Pratt and King before they left. After Pratt and King left, M.A. laid out her pajamas, undressed herself, put on her pajamas, and went to bed. There is no evidence she was sick or intoxicated to the point of helplessness. She did not vomit, slur her words, or lose consciousness. Most important, in her own words, M.A. was clearheaded. *Cf. State v. Lopez*, No. 10-0766, 2012 WL 163232, at *5 (Iowa Ct. App. Jan. 19, 2012) (considering these factors to establish mental incapacity by intoxicating

substance); *see also Freeman v. Busch*, 199 F.Supp.2d 907, 908 (S.D. Iowa 2002) (finding sufficient evidence for incapacity where victim had been drinking, was passed out, and had been vomiting); *State v. Hernandez*, No. 12-2224, 2013 WL 5951384, at *4 (Iowa Ct. App. Nov. 6, 2013) (same). Here, the jury simply crossed the bounds of permissible inference and entered the forbidden territory of conjecture and speculation. *See Shelton v. United States*, 505 A.2d 767, 771 (D.C. 1986).

For this reason, we vacate the defendant's conviction for Count I.

## B.

King challenges the sufficiency of the evidence supporting his conviction for Count II, burglary in the first degree with bodily injury. *See* Iowa Code § 713.3(1)(c). The marshalling instruction provided as follows:

> 1. On or about December 21, 2014, Defendant broke or entered into an occupied structure located at 620 Sixth Avenue N.W., Waverly, Iowa.
> 2. One or more persons were present in the occupied structure.
> 3. Defendant had no right, license, or privilege to break or enter into the occupied structure or exceeded his rights with respect to the time of entering or the place into which he entered.
> 4. Defendant broke or entered into the occupied structure with the specific intent to commit an assault on [M.A.].
> 5. Defendant intentionally or recklessly inflicted bodily injury on [M.A.] in the occupied structure.

King challenges the evidence supporting elements three through five. We begin and end our inquiry with the element five, specifically whether the State proved King intentionally or recklessly inflicted a bodily injury.

The supreme court has defined bodily injury as "physical pain, illness, or any impairment of physical condition." *State v. Gordon*, 560 N.W.2d 4, 6 (Iowa 1997). The *Gordon* court concluded "[a] red mark or bruise" alone is insufficient to

prove an impairment of a physical condition. *See id.* However, in *State v. Taylor*, 689 N.W.2d 116, 136 (Iowa 2004), the court concluded there might be cases in which bruising, cuts, and scratches, even when inflicted without pain, could prove an impairment of physical condition.

Here, there is insufficient evidence to establish King intentionally or recklessly inflicted any bodily injury. The State did not offer any medical evidence establishing a bodily injury. M.A. did not testify she suffered any physical pain, illness, or impairment of her physical condition. The only testimony M.A. provided regarding her physical condition was she felt uncomfortable. But she specifically denied feeling any pain, testifying, "It wasn't painful." The defendant called a medical expert to testify. The expert testified M.A. had a "red area" on her cervix in an area "that should have been pink." The expert testified it "would be fair" to say we do not know if the discoloration was an injury. The expert also testified the causation of the discoloration was unknown.

During closing argument, the prosecutor repeatedly referenced M.A.'s pain and bruising, but the prosecutor's argument was not supported by the record. It is telling the State does not even defend this count on appeal. When the evidence is viewed in the light most favorable to the verdict, there is not substantial evidence to support the finding the defendant intentionally or recklessly caused M.A. to suffer bodily injury. We thus vacate the defendant's conviction for Count II.

We also conclude there is not substantial evidence to support either of the lesser-included offenses. The jury was instructed that if they found King not guilty on Count II, they were to consider the crime of attempted burglary. As instructed, that offense required the State to prove King "intentionally or recklessly inflicted

bodily injury on [M.A.] in the occupied structure." Because we have already concluded there was insufficient evidence of bodily injury, we conclude there is not substantial evidence of attempted burglary.

The jury was also instructed to consider trespass as a lesser-included offense. The State was required to prove King "entered in the house" and "did not have express permission of the owner, lessee, or person in lawful possession of the house to enter." The uncontroverted trial testimony of Carolus and West, the lessees, established King had express permission to be in the house at any time, including the evening at issue. There is thus not substantial evidence in support of either of the lesser-included offenses of burglary.

## C.

King contends the evidence is insufficient to support his conviction for Count III, sexual abuse in the third degree, pursuant to Iowa Code section 709.1and 709.4(1)(d). The State was required to prove:

> 1. On or about December 21, 2014, Defendant performed a sex act with [M.A.] in Bremer County, Iowa.
> 2. Defendant performed the sex act while [M.A.] was mentally incapacitated or physically helpless.

King challenges element two, mental incapacitation and physical helplessness. "'Mentally incapacitated' means that a person is temporarily incapable of apprising or controlling the person's own conduct due to the influence of a narcotic, anesthetic, or intoxicating substance." Iowa Code § 709.1A(1). "Physically

helpless" means "a person is unable to communicate an unwillingness to act because the person is unconscious, asleep, or is otherwise physically impaired." Iowa Code § 709.1A(2).

In the light most favorable to the verdict, there is sufficient evidence to establish physical helplessness. M.A. testified that she was asleep, awoke to vaginal discomfort, and removed a condom from inside her body. She recognized King after hearing his voice and told him to leave. Immediately after King left the house, M.A. went to Carolus and told her she had been raped. Her conversations with King the next day included her continuing to make these claims. She testified that a sexual act must have occurred while she was asleep. While King testified to a different version of events, the jury was free to credit M.A.'s testimony.

We note that the evidence supporting mental incapacity is far weaker. While M.A. testified she had been drinking, there was evidence she had been drinking water much of the night because her mother was present at the party. There is little to no evidence M.A.'s alcohol consumption rendered her unable to apprise or control her own conduct. She testified she was able to walk independently, converse, and complete tasks like laying out pajamas and readying herself for bed. M.A. did not slur, fall, vomit, or otherwise display signs of excessive alcohol consumption. *See State v. Lopez*, 2012 WL 163232, at *5; *see also Freeman v. Busch*, 199 F.Supp.2d at 908; *State v. Hernandez*, 2013 WL 5951384, at *4. She remembers the night, and, in her own words, her mind was "clear."

We question the validity of a conviction where the marshaling instruction sets forth in the disjunctive different modes for the State to prove an offense—here "mentally incapacitated" or "physically helpless"—where the evidence might be

insufficient to support one of the modes but the jury was asked to return only a general verdict. However, this court has recognized that any such concern cannot be raised sua sponte. Instead, the claim must be raised as an objection to the jury instruction or a claim of ineffective assistance of counsel. *See State v. Thorndike*, 860 N.W.2d 316, 321 (Iowa 2015) ("At the outset, it is important to note that this case comes before us in the context of an ineffective-assistance-of-counsel claim, as opposed to a direct appeal objecting to the legality of a jury instruction."); *State v. Maldonado*, No. 15-0305, 2016 WL 1358598, at *4 (Iowa Ct. App. Apr. 6, 2016) ("It is the instructional error in the alternative-theory cases, in combination with the use of a general verdict form, that requires an appellate court to remand for a new trial. Maldonado does not allege such error, nor does he request a new trial based on faulty marshalling instructions or general verdict forms. Accordingly, we do not grant the relief afforded in *Tyler*, *Smith*, and *Hoegrefe*."). Neither claim is presented in this appeal, and we need not address the issue further.

When the evidence is viewed in the light most favorable to the jury's verdict, there is substantial evidence supporting the defendant's conviction for sex abuse in the third degree on the ground the victim was "physically helpless." We affirm the defendant's conviction.

IV.

King argues trial counsel provided ineffective assistance by failing to raise a voluntary intoxication defense and request an intoxication instruction. The framework for ineffective assistance is outlined above. *See Maxwell*, 743 N.W.2d at 195. "We ordinarily preserve [ineffective assistance] claims for postconviction relief proceedings. That is particularly true where the challenged actions of

counsel implicate trial tactics or strategy which might be explained in a record fully developed to address those issues." *State v. Clay*, 824 N.W.2d 488, 494 (Iowa 2012). Because we believe this challenge requires a more fully developed record, we preserve these claims for postconviction relief.

V.

For the reasons outlined above, we vacate the defendant's convictions for burglary in the first degree and affirm the defendant's conviction for sex abuse in the third degree. We remand this matter for resentencing. We preserve the defendant's claim of ineffective assistance of counsel.

**SEXUAL ABUSE CONVICTION AFFIRMED, BURGLARY CONVICTIONS VACATED, AND REMANDED FOR RESENTENCING.**